GOODMAN, J.**
*991 Arthur Blech died in 2011, leaving an estate worth in excess of $65 million. At his death, his estate planning documents included the Arthur Blech Living Trust, as amended, and his will, which provided for the "pour over" of most of his remaining assets into the Trust, to be administered as part of the corpus of the Trust by a third party trustee. Arthur *992 left most of his estate in unequal shares to his four children, Raymond, Richard, Robert and Jenifer.[1] The current successor trustee is respondent Comerica Bank.
The issues presented in this appeal relate to how to account for the sale of the 3,050-acre Blech Ranch (the Ranch or the Blech Ranch), located in San Luis Obispo County, California. When the Trustee filed a petition for approval of its first accounting in October 2014, Raymond objected to the allocation, principally on the basis that all of the capital gains tax (income tax) on the sale was allocated to his share. The probate court bifurcated that issue from other objections to this petition and, after a hearing, determined that allocation to be appropriate. Thereafter, with the exceptions we consider on this appeal, the Blech Children resolved their differences, entered into separate settlement agreements with the Trustee and stipulated that the *433 court could enter an order approving the Trustee's first accounting.
Raymond has filed four separate appeals from the probate court's rulings. In the unpublished portions of this opinion, we resolve which of those appeals is viable and other procedural issues; also confirming the award of attorney fees to three of the Blech Children. In the published portion of this opinion we determine that the gift of the Blech Ranch (and of its equivalent in cash as of the date of its sale) was a funding mechanism for Raymond's 35% share of the remainder or residue of the estate rather than an additional specific gift to him.
FACTUAL AND PROCEDURAL HISTORY [2]
Arthur executed the Arthur Blech Living Trust (the Trust) in 2009, designating himself its initial trustee. At the same time, he executed a will in *993 which he made certain specific bequests, and provided for the "pour over" of the balance of his estate into the Trust. In 2010, he amended article 5.4 of the Trust, adjusting the share for his son Robert to reflect a loan made to him. Arthur died on January 13, 2011. Following the declination by the originally named successor trustee to serve, first, Union Bank, N.A., and then Comerica Bank (the Trustee), served as successor trustee.
Article 5 of the Trust set out the terms of administration and distribution of Arthur's assets on his death, providing for: distribution of his personal effects in article 5.2, and the making of specific distributions of cash to Robert, Richard and Jenifer and other named individuals, and of a gift of a specified parcel of real property to Raymond, in article 5.3. Article 5.4 provided for distribution of the remainder of the trust estate as follows: 25 percent to Robert, 15 percent to Jenifer, 25 percent to Richard, and 35 percent to Raymond, provided that Raymond's share "shall include any interest that [Arthur] ... owns in the ranch [in San Luis Obispo County]."[3] Article 5.5 provided for payment of income and *434 estate taxes as follows: "All estate taxes payable by this Trust shall be paid by the beneficiaries listed in Paragraph 5.4 above in direct proportion to their respective percentage shares. Income taxes payable by any subtrust shall be paid by the beneficiary of such subtrust." Article 5.7 provided that the gifts made in article 5.4 would be distributed to the Blech Children in fractional interests over a 10-year period.
In late 2013, Raymond negotiated the sale of the Ranch for $14 million, signing an agreement for its sale in December 2013. The sale price represented a gain over the estate tax basis for the Ranch of approximately $6.8 million.[4]
Prior to presenting the sale to the probate court for approval, the Trustee distributed to the Blech Children a financial analysis (the spreadsheet) which *994 contained estimated allocations of assets in the trust estate to each beneficiary pursuant to the terms of the Trust, also allocating estimated expenses chargeable to each sibling, as well as net distributable amounts to each. The second line of the spreadsheet contained the following: "For Discussion Purposes-Not Final Calculations and May Not Be Relied Upon for Any Purposes."
On February 13, 2014, the probate court approved the sale, which closed on March 25, 2014. The income tax on the sale was charged against Raymond's share.
The Blech Children became engaged in numerous intra-family disputes, including those concerning allegations of mismanagement of a 19-story office tower owned by the Trust; allegations that two of the siblings had received improper distributions; and allegations of improper actions by Raymond acting as executor of the will. These disputes led to lawsuits among the Blech Children; by the then-trustee (Union Bank) against certain of the Blech Children; the filing by Robert and Jenifer of a petition for suspension of Raymond's powers and his removal as executor; the filing of objections to Raymond's First Account of Executor; and the filing by Raymond of a Petition for Contractual Indemnity and other relief arising out of his actions as executor. The Blech Children reached a tentative settlement of their disputes over Raymond's work as executor of the will six days prior to a July 2014 court hearing on that matter. That settlement was memorialized in a Settlement Agreement and Release, executed as of August 27, 2014 (the 2014 Settlement Agreement), in which the Blech Children agreed upon mutual releases of all claims, known or unknown, specifically referencing and waiving their rights under Civil Code section 1542, reserving, however, their individual rights to pursue certain claims (e.g., the right to dispute expenses of administration of the estate and trust arising on and after August 1, 2014, or not paid prior to that date).[5]
Paragraph 15 of the 2014 Settlement Agreement specifies that each of the Blech Children "takes complete responsibility for any tax liability which may arise from that party's receipt of any consideration, asset ... or any other form of monetary or nonmonetary value received under this Agreement or in connection herewith, including from the Estate, the Trust, any asset of the Estate or Trust ... [or] Blech Ranch Company, LLC.... Each party agrees that any tax liability, whether local, *435 state, federal or other, arising from such receipt by or to that party ... including but not limited to property taxes, *995 reassessment penalties, gift taxes, income taxes, or estate taxes, shall be that party's sole responsibility."
The Trustee filed its First Account and Report of Trustee and Petition for Approval Thereof; Petition for Allowance of Extraordinary Trustee's Fees (the Petition) on October 29, 2014. The probate court granted an extension of time in which to file objections to the Petition, setting the deadline to do so at January 15, 2015. On that date, Raymond filed a set of objections, as did Robert and Jenifer. Following the Trustee's filing of responses to his objections, on May 19, 2015, Raymond filed a Supplement to Objections (Supplemental Objections) in which he raised for the first time the objection that the gift of the Ranch to him had been improperly characterized as a specific gift when, in his view, it should be characterized as a residuary gift. If characterized as a residuary gift, Raymond argued, the "expenses and costs of such gifts should be borne by the Trust as a whole."[6]
At the June 11, 2015 trial setting conference on the Petition, and with the consent of the parties, the probate court bifurcated Raymond's Supplemental Objections, setting them for determination in advance of hearing the parties' other objections to the Petition.
At the conclusion of the hearing on the Supplemental Objections on July 13, 2015, the probate court affirmed the Trustee's deduction of the income tax and other expenses attributable to the Ranch from the proceeds of the sale and from Raymond's share of the inheritance, rejecting Raymond's contrary claims, and specifically finding that the Trustee's actions "satisfied the intent of the Trustor, Arthur Blech."[7] The probate court also ruled Raymond had "consented to and affirmed [the Trustee's] treatment of the Blech Ranch gift [pursuant to Probate Code section 16465 ], and the other Beneficiaries relied upon Raymond's actions, and Raymond is thus estopped from now challenging that treatment." In addition, it ruled Raymond had released the specific objections made in his Supplemental Objections by signing the 2014 Settlement Agreement. The probate court filed an Order Overruling Raymond Blech's Supplement to Objections to Trustee's First Account and Report on August 19, *996 2015 (August 19, 2015 Order) setting out these determinations. Notice of entry of that order was given on September 10, 2015.
Two months later, on September 28, 2015, Robert and Jenifer sought to enforce the 2014 Settlement Agreement by filing their Motion to Enter Judgment on Settlement Agreement, Enforce Settlement Agreement, and for Attorneys' Fees and Costs. The probate court considered this motion to be "premature," and, on October 30, 2015, placed it off calendar.
*436 Seeking to overturn the August 19, 2015 Order, Raymond filed a motion for new trial and a motion to vacate. The probate court denied these motions on October 30, 2015, noting no judgment had been entered and the orders made in August following the trial on the bifurcated issue were not separately appealable.
During the late summer and fall of 2015, the parties had negotiated and reached agreements to resolve all of the objections to the Petition except for Raymond's Supplemental Objections. They set out their settlements in two agreements, one among the Blech Children other than Raymond and the Trustee, and another between Raymond and the Trustee. (These documents are collectively referred to as the 2015 Settlement Agreements.) In the latter agreement, Raymond reserved his right to appeal the probate court's August 19, 2015 Order. With the 2015 Settlement Agreements signed, the Blech Children stipulated to have the probate court enter an order approving the Petition based on those agreements, also preserving Raymond's Supplemental Objections for appeal. The probate court filed its Order Granting Stipulated Ex Parte Application for Entry of Order Approving Settlement of Trustee's First Account on October 23, 2015 (October 23, 2015 Order).[8]
On October 30, 2015, the probate court denied Raymond's motions for new trial and to vacate its rulings on his Supplemental Objections and took off calendar Robert and Jenifer's motion to enforce the 2014 Settlement Agreement.
On November 6, 2015, Robert and Jenifer renewed their motion to enter judgment on the 2014 Settlement Agreement and for attorney fees. Also on that date, Raymond renewed his motion for new trial and his motion to vacate.
*997 The motion for new trial and motion to vacate were heard and submitted on December 4, 2015; the probate court's ruling on these matters was issued on December 29, 2015. Raymond filed a notice of appeal of these matters seven days prior to the ruling issued by the probate court, on December 22, 2015. The court denied both motions in its December 29, 2015 ruling.
Robert and Jenifer's motion to enter judgment and for attorney fees and costs was heard and granted on January 7, 2016.[9] Raymond filed a timely notice of *437 appeal of these rulings on February 4, 2016.
Robert and Jenifer filed a second motion, for additional attorney fees and costs, which the probate court also granted, and from which Raymond filed a timely notice of appeal on May 2, 2016. With the stipulation of the parties, we consolidated these appeals.
*998 CONTENTIONS
Raymond frames the primary issue on appeal as whether the probate court erred in allocating the postdeath appreciation in the Ranch among all of the Blech Children (with a consequence that his share in that appreciation was limited to his 35 percent of the residue) while charging Raymond with all postdeath taxes and expenses on the sale of the Ranch. Raymond also contends the probate court erred in finding he: (a) released any objections to the Trustee's allocations by his execution of the 2014 Settlement Agreement with his siblings, (b) consented to those allocations, and (c) is barred by equitable estoppel or laches from asserting his objections to the Trustee's treatment of his interest in Arthur's Trust. And, Raymond challenges the attorney fee awards made to his siblings as prevailing parties in the probate court.
Robert and Jenifer, joined by Richard, dispute Raymond's contentions, arguing: (a) the release contained in their 2014 Settlement Agreement precludes Raymond from prevailing on any of his claims; (b) he is estopped from asserting his claim; (c) he is barred by laches from doing so; (d) the probate court properly upheld the Trustee's allocation of gain; and (e) the attorney fee awards were proper.
The Trustee argues: (a) Raymond disclaimed in the probate court the allocation argument he now asserts; (b) his objections to the Trustee's accounting were barred because he accepted the distribution of the net proceeds from the sale of the Ranch without then raising the impact of the distribution on the final amount to be allocated to him; and (c) he released all of his claims in the 2014 Settlement Agreement.
DISCUSSION
*438 I.-V.***
VI. CONSTRUCTION OF THE RESIDUARY BEQUEST AND ALLOCATION OF APPRECIATION IN VALUE OF THE RANCH
Between the time of Arthur's death and the sale of the Blech Ranch, its fair market value increased from $7.2 million to $14 million, at which price the Ranch was sold. The proceeds of the sale were allocated to Raymond's subtrust and the income taxes on the sale of the Ranch, $2.3 million, were *999 paid from that source.[28] The probate court ruled that this allocation of tax liability was correct and that it was proper to use the $14 million valuation in allocating the remainder of the assets of the Trust among all of the Blech Children in accord with their percentage shares of the residue of the Trust.
Raymond contends the value of the Ranch should have been allocated based on its date-of-death value (with Raymond receiving the entire net proceeds of its sale, including the appreciation in the value of the Ranch following Arthur's death) based on the probate court's ruling that "The gift of Blech Ranch to Raymond Blech was not a residuary gift under California Probate Code § 21117(f)."[29]
Raymond's argument in support of this claim is that the probate court's ruling that the Ranch was not a residuary gift meant that it must be valued at its date-of-death value of $7.2 million rather than at its $14 million sale price (as a substitute for its date-of-distribution value). Thus, Raymond contends the probate court's ruling granting the Trustee's Petition, in which the Ranch was valued for allocation among the siblings at its sale price, was erroneous.
Raymond supports his argument using the term "specific gift," and, although the probate court did not use that term in its ruling, it is an acceptable shorthand to analyze Raymond's contention. If Raymond were correct, he would be the sole distributee of the $4.5 million net proceeds of the sale of the Ranch (the difference between the sale price of $14 million and the sum of $7.2 million [the valuation of the Ranch on the date of Arthur's death] and the $2.3 million in taxes paid] )-and would additionally share in 35 percent of the remainder of the Trust estate.[30]
On appeal, we review the probate court's ruling, not its reasons, and affirm if the ruling is correct albeit the reasons are not; we also resolve any ambiguities in favor of affirmance. (See, e.g., In re Marriage of Arceneaux (1990) 51 Cal.3d 1130, 1133, 275 Cal.Rptr. 797, 800 P.2d 1227 ["A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness."]; Munoz v. Olin (1979) 24 Cal.3d 629, 635-636, 156 Cal.Rptr. 727, 596 P.2d 1143.)
*1000 The probate court's characterization of this gift (and of all gifts made in the Trust) was a legal determination on undisputed facts which we review de novo. ( *439 People ex rel. Lockyer v. Shamrock Foods (2000) 24 Cal.4th 415, 432, 101 Cal.Rptr.2d 200, 11 P.3d 956 ; Lozada v. City and County of San Francisco (2006) 145 Cal.App.4th 1139, 1145, 52 Cal.Rptr.3d 209.) As we now discuss, that characterization was in error, but, once corrected, it does not alter the probate court's determination to value the Ranch at its sale price in determining the distribution of the remainder of the Trust (including in the amount to be distributed the net proceeds from the sale of the Ranch) among the Blech Children.[31]
A. Lexicon of gifts
A revocable living trust such as that under review in this case contains transfers to be effective on the death of the settlor. Such transfers are statutorily described as "at-death transfers." ( Prob. Code, § 21104.) The Probate Code provides for six types of "at-death transfers": "(a) A specific gift is a transfer of specifically identifiable property. [¶] (b) A general gift is a transfer from the general assets of the transferor that does not give specific property. [¶] (c) A demonstrative gift is a general gift that specifies the fund or property from which the transfer is primarily to be made. [¶] (d) A general pecuniary gift is a pecuniary gift within the meaning of Section 21118.[32 ][¶] (e) An annuity is a general pecuniary gift that is payable periodically. [¶] (f) A residuary gift is a transfer of property that remains after all specific and general gifts have been satisfied." ( Prob. Code, § 21117.)
*1001 We observe, however, that while the parties and the probate court directed their analysis of the terms of the Trust to discuss application of these several types of postdeath transfers, to properly construe the terms of the Trust we must acknowledge the terms of Probate Code section 21102. That section provides: "(a) The intention of the transferor as expressed in the instrument controls the legal effect of the dispositions made in the instrument. [¶] (b) The rules of construction in this part [of the Probate Code] apply where the intention of the transferor is not indicated by the instrument."[33] (Cf.
*440 Probate Code § 16335, subd. (a)(1), which requires that the terms of the particular dispositive plan be carried out even when they differ from that which would otherwise be called for under a statute.)
We also consider in construing the terms of the Trust, Probate Code section 21121, which provides, "All parts of an instrument are to be construed in relation to each other and so as, if possible, to form a consistent whole. If the meaning of any part of an instrument is ambiguous or doubtful, it may be explained by any reference to or recital of that part in another part of the instrument." And, Probate Code section 21122 advises: "The words of an instrument are to be given their ordinary and grammatical meaning unless the intention to use them in another sense is clear and their intended meaning can be ascertained. Technical words are not necessary to give effect to a disposition in an instrument. Technical words are to be considered as having been used in their technical sense unless (a) the context clearly indicates a contrary intention or (b) it satisfactorily appears that the instrument was drawn solely by the transferor and that the transferor was unacquainted with the technical sense."
The common law provides additional guidance: "The interpretation of a will or trust instrument presents a question of law unless interpretation turns on the credibility of extrinsic evidence or a conflict therein. [Citations.]" ( Burch v. George (1994) 7 Cal.4th 246, 254, 27 Cal.Rptr.2d 165, 866 P.2d 92 ; see Tunstall v. Wells (2006) 144 Cal.App.4th 554, 561, 50 Cal.Rptr.3d 468 [same]; see Prob. Code, § 21102, subd. (c).) Our Supreme Court has explained: "Extrinsic evidence is 'admissible to interpret the instrument, but not to give it a meaning to which it is not reasonably susceptible' [citations], and it is the instrument itself that must be given effect. [Citations.] It is therefore solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence." ( *1002 Parsons v. Bristol Development Co. (1965) 62 Cal.2d 861, 865, 44 Cal.Rptr. 767, 402 P.2d 839 ; see Gardenhire v. Superior Court (2005) 127 Cal.App.4th 882, 888, 26 Cal.Rptr.3d 143.)
In the case of undisputed evidence but conflicting inferences, we apply the following standard of review: "[W]here the evidence is undisputed and the parties draw conflicting inferences, [the appellate court] will independently draw inferences." ( City of El Cajon v. El Cajon Police Officers' Assn. (1996) 49 Cal.App.4th 64, 71, 56 Cal.Rptr.2d 723 ; see Parsons v. Bristol Development Co., supra, 62 Cal.2d at p. 866, fn. 2, 44 Cal.Rptr. 767, 402 P.2d 839.) As noted, ante , Probate Code section 21121 requires that we construe all parts of the instrument in relation to the others to form "a consistent whole." And, if the meaning of any part of an instrument is ambiguous or doubtful, "it may be explained by any reference to or recital of that part in another part of the instrument." (Ibid .; see Colburn v. Northern Trust Co. (2007) 151 Cal.App.4th 439, 448, fn. 6, 59 Cal.Rptr.3d 828 ; Siegel v. Fife (2015) 234 Cal.App.4th 988, 996, 184 Cal.Rptr.3d 531.)[34]
*441 We observe that, applying these principles, this district has previously held that there "is no substantial difference between the words 'remainder' and 'residue,' " and that "in construing a will [or a trust] the aim is to ascertain the meaning of the testator [or settlor] rather than the meaning of the words used." ( Estate of Moorhouse (1944) 64 Cal.App.2d 210, 214-215, 148 P.2d 385.)
B. Structure and Terms of the Trust
The principal dispositive provisions of the Trust are set out in its article 5. After gifting his personal effects to his children "in such manner as they mutually agree" (art. 5.2), and making specific pecuniary gifts to family members and others (art. 5.3), Arthur directed the disposition of the remainder of his trust estate in a separate paragraph, headed "Division of Remaining Trust Estate" (art. 5.4), as follows: "As soon as reasonably practicable after the death of Grantor and after distributions, if any, pursuant to the provisions of Paragraphs 5.2 and 5.3, and further subject to the provisions of this Paragraph, the Trustee shall divide the remaining Trust estate into separate shares as follows. ..." In the next four subparagraphs, Arthur allocated the "Remaining Trust Estate"-by percentages-to his four children, subject to certain adjustments for outstanding loans, and in the case of Jenifer and *1003 Raymond, the direction to include in that child's share "any interest that Grantor or this Trust directly or indirectly owns in [described real property]...."
Article 5.5 provides: "All estate taxes payable by this Trust shall be paid by the beneficiaries listed in Paragraph 5.4 above in direct proportion to their respective percentage shares. Income taxes payable by any subtrust shall be paid by the beneficiary of such subtrust."
Cash flow was to be distributed to each beneficiary quarterly from his or her share. (Art. 5.6.) Finally, the principal given to each beneficiary was to be distributed to that beneficiary over 10 years, beginning on the first anniversary of Arthur's death. (Art. 5.7.)
In construing the terms of the Trust, as noted, we seek to ascertain the grantor's intent by the language of the document as of the time he signed it. ( Estate of Helfman (1961) 193 Cal.App.2d 652, 655, 14 Cal.Rptr. 482.) Each case depends upon its particular facts. ( Ibid., citing Estate of Henderson (1911) 161 Cal. 353, 357, 119 P. 496.)
C. Discussion
We do not agree with the probate court's ruling that the instruction in article 5.4 that Raymond's 35 percent share was to include the Ranch made it "not a residuary gift."[35] Because the division directed by article 5.4 was to be made only after all other gifts have been made, it is clear that article 5.4 was intended to dispose of the remainder (or residue) of Arthur's estate. Gifts which are made from the assets which remain in an estate are gifts of remainder or residuary interests. This end-stage funding is entirely consistent with Probate Code section 21117, subdivision (f), which states: "A residuary gift is a transfer of property that remains after all specific and general gifts have been satisfied." It is also consistent with the case authority cited, ante .
Most importantly, our construction of article 5.4 carries out the "intention of the *442 transferor as expressed in the instrument...." ( Prob. Code, § 21102, subd. (a).) Had Arthur intended the gift of the Ranch to be a specific gift, he had the mechanism to so designate it. Indeed, he had made such a gift to Raymond in article 5.3; there, he gave Raymond a specific gift, also of real property, i.e., of the house and land that adjoined the Ranch, using the following language: "(e) The Trustee shall distribute to RAYMOND that certain real property...." (We omit the specific legal description of the land *1004 given, that included a home adjacent to the Ranch.) This gift in article 5.3(e) was unconditional and specific (as was a gift of a house to Jenifer, also set out in article 5.3), and was made with no language that is either conditional or equivocal: Neither gift was dependent on any other event.
By contrast, the "gift" of the Ranch to Raymond in article 5.4 was only a funding mechanism for the actual gift-which was stated as a percentage of the remainder or residue of the Trust estate. Thus, the gift of the Ranch to Raymond was to occur only if at the time of the distribution of the remainder of the trust assets, those assets included the Ranch. (Art. 5.4(b).) What was not conditional was that Raymond was to receive 35 percent of the residue regardless of whether the Ranch was part of the Trust estate: that was a residuary gift to Raymond.[36]
This means of expressing the desire that, if the Ranch were in the estate at the date of distribution, then it was to be used in funding Raymond's share of the residue, rendered the gift of the Ranch an instruction to the Trustee on that with which to fund the percentage gift which Arthur unequivocally made to Raymond if the Ranch were an asset of the Trust at that time, rather than a mandate that Raymond was to receive the Ranch as well as 35 percent of the remainder or residue of assets in the Trust on their distribution. Such an instruction is entirely consistent with Raymond's long-standing and intense involvement with Ranch operations. One also must consider that Raymond receives a substantially greater percentage of the residue than any other sibling. We would expect that, had Arthur intended Raymond to also receive the entirety of any appreciation in the value of the Ranch, Arthur would have expressly so stated in the Trust.
Setting aside our conclusion that Arthur's intention was to make the gifts of the balance of his estate as discussed above (as expressed in Probate Code section 21102 ), in the context of Probate Code section 21117 upon which the parties presented their arguments to the probate court, the direction in article 5.4(b) (and in article 5.4(c) with respect to Jenifer) concerns how to fund Raymond's percentage share of the remainder or residue and not what specific property to give . In the context of section 21117, the gift to Raymond in article 5.4(b) was a gift of a 35 percent share of the residue within the meaning of Probate Code section 21117, subdivision (f), and not a specific gift as defined in subdivision (a) of that statute.
The proper construction of residuary clauses which include reference to specific property of a decedent has been an issue in this state for many *1005 years. For example, in 1907, our Supreme Court considered this matter in In re Painter's Estate .[37] *443 ( (1907) 150 Cal. 498, 89 P. 98 ( Painter's Estate ).) There, our Supreme Court was called upon to determine whether a provision in the codicil to the will of that decedent describing specific properties owned by the decedent were specific gifts and for that reason not chargeable with the payment of general legacies. ( Id . at p. 503, 89 P. 98.) Because the listing of specific properties to be devised in that will was followed immediately by a statement that those properties were to be given together with all of the decedent's other property , the court determined that they were part of the residue rather than specific gifts. In reaching this determination, our Supreme Court stated: "In short, the question is purely one of construction. The testator's intent is to be determined in each case from a consideration of the particular language employed. A bequest or devise of the residue of an estate is general, because such residue is not ascertainable at the time the will is made. The fact that, in giving such residue, the testator describes, as included in it or forming a part of it, certain specific property owned by him, does not alter the character of the residuary gift." ( Id . at p. 507, 89 P. 98.)
Confirming this reasoning, the court pointed out that a legacy is specific only when, if that property is not vested in the decedent at the time of his or her death, it fails, citing Civil Code section 1357.[38] ( Painter's Estate, at p. 505, 89 P. 98.)
The language of the Trust in this case presents an even clearer statement of the nature of the gift of designated property than in Painter's Estate : the gift here is of 35 percent of the residue, utilizing the Ranch as an asset with which to fund the gift to Raymond in recognition of his long and *1006 close association with it, but a 35 percent share nonetheless, even if the Ranch is no longer owned at the time of Arthur's death.
VII.-VIII.†
DISPOSITION
The October 23, 2015 Order Settling the Trustee's First Account, filed October 29, 2014, is affirmed. The Orders entered on January 7 and March 18, 2016, awarding attorney fees to Robert and Jenifer, and the Order entered on January 7, 2016, awarding attorney fees to Richard, are affirmed. All other appeals are dismissed.
*444 Richard, Robert and Jenifer shall each recover his or her attorney fees and costs on appeal from Raymond.
We concur:
EDMON, P.J.
LAVIN, J.

Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

For clarity, we refer to family members by their first names; we mean no disrespect. We also note Robert spells his surname "Bleck" and Jenifer is also known as Jenifer Rush and as Linda Sue Grear.
When we reference the children as a group, we use the terms "Blech Children" or "the siblings."

During the pendency of this appeal, on March 2, 2018, Raymond filed a request for judicial notice pursuant to Evidence Code sections 452, 454 and 459, or in lieu thereof, a request that we take additional evidence as permitted by Code of Civil Procedure section 909, seeking to have this court take judicial notice of the contents of the reporter's transcript of proceedings in the probate court which occurred on January 10, 2018, and of a declaration of William Buckley, a senior vice president of the Trustee. Respondents filed oppositions to these requests.
These requests are denied for the following reasons. In reviewing the correctness of the probate court's determination, we consider only those matters that were part of the record at the time an order or judgment was entered (with limited exceptions, none of which is present). (Reserve Insurance Co. v. Pisciotta (1982) 30 Cal.3d 800, 813, 180 Cal.Rptr. 628, 640 P.2d 764 ; see also In re Zeth S. (2003) 31 Cal.4th 396, 407-410, 413, 2 Cal.Rptr.3d 683, 73 P.3d 541 [it is generally inappropriate for an appellate court to look to matters not before the trial court at the time it made its rulings].) Nor has Raymond suggested there are circumstances which qualify as "exceptional" to warrant taking evidence pursuant to Code of Civil Procedure section 909. (Cf. Reserve , at p. 813, 180 Cal.Rptr. 628, 640 P.2d 764 ; In re Conservatorship of Hart (1991) 228 Cal.App.3d 1244, 1257, 279 Cal.Rptr. 249.) Also, in its opposition, the Trustee advised us that the Buckley declaration was rejected by the probate court, an action which Raymond does not dispute. As this declaration was never admitted by the trial court, it would not qualify for judicial notice in any event.

Raymond was designated manager of the Ranch in its Operating Agreement. He had lived for many years on an adjacent parcel in the house located on 78 acres of land which was also left to him in article 5.3 of the Trust.
Jenifer's share included a provision similar to that for Raymond, referencing a certain residence in Montana if the Trust then owned it.

The income tax on this sale was estimated at 33 percent of the gain, or approximately $2,376,000.

This 2014 Settlement Agreement, among the Blech Children only, is to be distinguished from two settlement agreements, among different groups of the Blech Children and the Trustee, and which we describe and reference, post , as the 2015 Settlement Agreements.

Thus, the $2.3 million in income tax on the sale of the Ranch (see fn. 4, ante ) would have been shared among all of the Blech Children, rather than being paid from Raymond's inheritance alone.
On April 6, 2015, Raymond's counsel had written a letter to the Trustee's counsel in which he raised the same argument.

The probate court stated it was relying in part on articles 5.5 and 5.6 of the Trust and Probate Code sections 21117, 21118, and 16374, subdivision (a).
The court also stated both that "[Arthur] included [the Ranch] in the part [i.e., article 5.4(b) of the Trust] that says that Raymond will get 35 percent" and that the gift of the Ranch was not a residuary gift. As we discuss, post , these statements are contradictory and the latter is an error of law.

We have considered-and reject-the argument that the October 23, 2015 Order left unresolved Raymond's Supplemental Objections. As we read this Order in the context of the proceedings that had taken place in the probate court up to October 23, 2015, the Order signed and filed that date fully resolved in the probate court all of the issues between the parties with respect to the Petition. Thus, the October 23, 2015 Order was a final order with respect to the Petition, and the proper subject for an appeal. (See Discussion, Section I, post .) The probate court judge had the same understanding of this Order when the issue was discussed on October 30, 2015.

Because the record reflects two efforts to obtain entry of judgment but no judgment appears in the record on appeal, we sent a letter to the parties inquiring, inter alia, if a judgment had ever been entered. In response to our letter, Raymond, on the one hand, and Robert and Jenifer, on the other, filed requests that we take judicial notice of the judgment entered on February 19, 2016. While we grant those requests (Evid. Code, §§ 452, subd. (d) & 459, subd. (a) ), we do not find these judgments relevant to resolving the issues raised by the several notices of appeal.
For reasons we discuss in footnote 8, ante , and more fully in the text, post , the October 23, 2015 Order fully resolved the issues in the Trustee's Petition then before the probate court and is itself an appealable order. We note that it was entered in part based on the 2014 and 2015 Settlement Agreements among the parties which contained provisions authorizing a court to enforce the terms of those agreements. The October 23, 2015 Order granted the Trustee's Petition, also making reference to these settlement agreements and approving their terms.
It was not until February 2016 that the first of the two "judgments," was signed and filed. This was well after the probate court no longer had jurisdiction over the matters determined in the October 23, 2015 Order as a consequence of Raymond's December 22, 2015 appeal, which terminated the probate court's jurisdiction over the orders identified in the December 2015 notice of appeal, including the October 23, 2015 Order. (Code Civ. Proc., § 916, subd. (a) ; see Critzer v. Enos (2012) 187 Cal.App.4th 1242, 1249, 115 Cal.Rptr.3d 203 [trial court lacked jurisdiction to enter a judgment while an appeal was then pending]; Varian Medical Systems, Inc. v. Delfino (2005) 35 Cal.4th 180, 198-199, 25 Cal.Rptr.3d 298, 106 P.3d 958 [further trial court proceedings on issues addressed in notice of appeal were beyond trial court's jurisdiction and void]; see Eisenberg, et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2017) ¶ 7:2.)
Also following our inquiry, Robert and Jenifer sought judicial notice of the judgment entered on April 25, 2016, reflecting the order granting them attorney fees, filed March 18, 2016. That order was independently appealable; the April judgment was issued after the probate court had lost jurisdiction in that matter. (Apex LLC v. Korusfood.com (2013) 222 Cal.App.4th 1010, 1015, 166 Cal.Rptr.3d 370 ; see also Sjoberg v. Hastorf (1948) 33 Cal.2d 116, 119, 199 P.2d 668 [appeal allowed if the order is final in a collateral proceeding "growing out of the action"].) The appeal of this order was based on the March order, and properly so. For these reasons, we do not give further consideration to these two postorder "judgments."

See footnote *, ante .

That Raymond is solely responsible for the income tax on the sale of the Ranch is clearly stated in Article 5.5 of the Trust; its second sentence provides: "Income taxes payable by any subtrust shall be paid by the beneficiary of such subtrust."

The quoted language is taken from the August 19, 2015 Order. The same legal conclusion appears in the probate court's December 29, 2015 Statement of Decision, following the filing of the October 23, 2015 Order from which Raymond's appeal is taken.

The actual amounts would be slightly different when costs of sale and expenses of operation of the Ranch are included.

We raised this issue with the parties in advance of oral argument, offering each an opportunity to submit a letter brief on this issue. The issue was also addressed at oral argument. Our determinations in this opinion include consideration of the parties' written and oral views.
We address the proper construction of the terms of the Trust as it involves an issue of law to be decided in this case on undisputed facts. Such matters may be raised for the first time on appeal. (Sea & Sage Audubon Society, Inc. v. Planning Com . (1983) 34 Cal.3d 412, 417, 194 Cal.Rptr. 357, 668 P.2d 664 [appellate court may address purely legal questions presented for the first time on appeal when no factual determinations are required]; Ward v. Taggart (1959) 51 Cal.2d 736, 742, 336 P.2d 534 [same].) And, as we held in Tsemetzin v. Coast Federal Savings & Loan Assn . (1997) 57 Cal.App.4th 1334, 1341, footnote 6, 67 Cal.Rptr.2d 726, it makes no difference that the issue is first raised on appeal by the court rather than the parties, as long as the parties have been given a reasonable opportunity to address it. (Accord, Barton v. New United Motor Manufacturing, Inc. (1996) 43 Cal.App.4th 1200, 1207, 51 Cal.Rptr.2d 328.) We may also do so because Raymond's theory on appeal requires that we interpret the terms of a written instrument (as well as the text of statutes), and there is no question of fact presented, only a question of law. (Palmer v. Shawback (1993) 17 Cal.App.4th 296, 300, 21 Cal.Rptr.2d 575.)

Section 21118, subdivision (b) defines a pecuniary gift as "a transfer of property made in an instrument that either is expressly stated as a fixed dollar amount or is a dollar amount determinable by the provisions of the instrument."

Probate Code section 21102, subdivision (c) provides: "Nothing in this section limits the use of extrinsic evidence, to the extent otherwise authorized by law, to determine the intention of the transferor." As we discuss in the text, the only extrinsic evidence in the record in this case is the drafting attorney's memorandum. (See, footnote 34, post .)

The memorandum, dated January 18, 2011, prepared by the lawyer who drafted the Trust characterizes article 5.4 as applying to the "Division of the Remaining Trust Estate"; thus, the lawyer who drafted the Trust viewed article 5.4 in the same manner as we describe it in the body of this opinion, i.e., as dividing the remainder, or residue, of the estate.

The probate court reached a similar conclusion as to the Montana property allocated to Jenifer's share.

The headings of the two articles of the Trust also suggest a difference in the nature of the gifts made. Article 5.3 is headed "Specific Distributions" and article 5.4 is headed "Division of Remaining Trust Estate."

In Painter's Estate, the Supreme Court relied in part on Civil Code section 1357, which defined "specific legacy" as follows: "A legacy of a particular thing, specified and distinguished from all others of the same kind, belonging to the testator, is specific; if such legacy fails, resort cannot be had to the other property of the testator." (Former Civ. Code, § 1357, ¶ 1.) (The definition of "specific gift" now is subdivision (a) of Probate Code section 21117.) Paragraph 4 of former Civil Code section 1357 defined a residuary legacy as follows: "A residuary legacy embraces only that which remains after all the bequests of the will are discharged."
At that time, Civil Code section 1317 provided: "A will is to be construed according to the intention of the testator." And section 1318 provided: "In case of uncertainty arising upon the face of a will, as to the application of any of its provisions, the testator's intention is to be ascertained from the words of the will, taking into view the circumstances under which it was made, exclusive of his oral declarations." (See, Estate of Loescher (1955) 133 Cal.App.2d 589, 593-594, 284 P.2d 902 ["Whether a devise is residuary, general, specific or administrative depends upon the intention of the testator as shown by the entire will. [Citations.]"].) The statutory definitions of specific and residuary legacies had not changed significantly from the time of the decision in Painter's Estate when Estate of Loescher was decided. (Compare former Prob. Code, § 161, enacted by Stats. 1931, ch. 281, p. 595; and see Historical and Statutory Notes, 52 West's Ann. Prob. Code (2002 ed.) foll. former § 161, p. 129, with Civ. Code, § 1357, extant at the time of the decision in Painter's Estate .)

See footnote 37, ante .

See footnote *, ante .