Filed 8/27/24  Estate of Van Proyen CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| Estate of DARYL P. VAN PROYEN, Deceased. | |
| TRACY DAVIS et al., Petitioners and Appellants, v. ANNETTE FRANCIS, Claimant and Respondent. | A168299 (Lake County Super. Ct. No. PR503267) |

In this appeal, the children of decedent Daryl P. Van Proyen challenge a portion of the trial court's judgment in favor of Annette Francis, decedent's live-in partner at the time of his passing.  After a bench trial, the court ordered decedent's trustee to pay Francis within 90 days either $331,550 or 10 percent of the net proceeds from the then-unconsummated sale of decedent's Lakeport house.  We conclude that the sale of the Lakeport house is a condition precedent to the obligation to pay Francis.  Therefore, we reverse the order compelling the 90-day payment or sale and remand to the trial court for further action.  In all other aspects, we affirm.

## BACKGROUND

Decedent and Jacqueline Van Proyen married and had two children: Tracy Davis and Renee Lopez.  Decedent survived his wife and developed a

1

relationship with Francis; the two lived together as a couple for 14 years before decedent's passing.

During his lifetime, decedent owned real property in California in the form of a house in Clovis, two rental units in Fresno, as well as a vacant lot and a residence in Lakeport. At the center of this dispute is the residence in Lakeport, which is a 5,853 square foot Victorian house situated on 50 acres of property, which decedent, a custom cabinet builder, designed and constructed over a 10-year period.

In March of 2018, decedent was diagnosed with cancer, and in April of 2021, decedent learned the cancer metastasized. On June 9, 2021, decedent passed away in Lake County, California.

## A. Decedent's Trusts

Decedent executed three trust instruments, all of which named Davis as a successor trustee. At the time of his death, decedent's operative trust was the "Daryl P. Van Proyen Revocable Trust of 2007 as Amended and Completely Restated May 28, 2020."

In 2007, decedent executed the first trust. After being diagnosed with cancer, decedent amended and restated the 2007 trust as of March 27, 2018. In relevant part, the 2018 trust permitted Francis "to continue to reside" in the Clovis house and included specific instructions to sell the Lakeport house "[s]hortly" after decedent's passing. Twenty percent of the proceeds from the Lakeport house sale were to be "retained in trust" to fund ongoing maintenance and operating expenses for the Clovis house, with the other 80 percent to be distributed evenly between Davis and Lopez. The 2018 trust also directed payment of "fifteen-hundred dollars per month" to Francis.

On May 28, 2020, decedent again amended and restated his trust. The 2020 trust devises the Clovis house to Francis "free and clear from the Trust"

2

and instructs the trust to "pay the real property tax for the fiscal year in which Settlor dies." The 2020 trust also gives Francis the "household furnishings" and "goods located in the House in Clovis, California." Although the 2020 trust does not specifically devise the Lakeport house or provide instructions for its sale, it includes a residuary clause, directing distribution of "[a]ll the remaining assets of the Trust" to Davis and Lopez "in equal shares."

In early June 2020, days after executing the 2020 trust, decedent listed the Lakeport house for sale at $3.49 million.[1]

In September of 2020, decedent removed the Clovis house from the 2020 trust and deeded it to himself and Francis as joint tenants.

On November 1, 2020, decedent handwrote an eight-page list with information for accessing bank accounts, credit cards, home safes, safe deposit boxes, and various other accounts along with other personal information, such as social security and driver's license numbers for decedent and Francis (the accounts list).

In the following months, decedent made several monetary gifts to Francis: two payments of $5,000 each on December 23, 2020; $99,000 on January 6, 2021; $25,000 on January 8, 2021; and $3,000 on January 11, 2021.

On February 20, 2021, decedent handwrote a ninth page (page 9), which reads: "After my passing [¶] start sending every year Dec. 1st $15,000 to [Francis] from acct # . . . Capitol [*sic*] One 360 money market[.] [¶] When the house has sold give [Francis] 10% of the net proceedes [*sic*] then you can

---

[1] Decedent, on behalf of the trust, signed the listing agreement on June 9, 2020; however, the effective date is listed as June 3, 2020.

stop the 15k + close the credit card acct[.]  [Francis] will be on her own from this point forward."[2]

In early May 2021, decedent and Davis met to review the accounts list so decedent could explain which accounts had been closed.[3]  At decedent's direction, Davis manually revised page 9 by crossing out the $15,000 payment obligation and writing in $4,000 instead.[4]  Decedent told Davis that "the $4,000 would help pay for property taxes" on the Clovis house.

On May 17, 2021, decedent gave Davis a check for $265,000, which represented the balance of the recently closed Capital One account referenced in page 9.  Decedent directed Davis to deposit the check into the trust's checking account and then transfer $100,000 to Francis.  Francis did not know why decedent gave her the money, but she believed it was for her "security."

On May 20, 2021, decedent called his family together for a meeting.[5] Decedent announced that he was of "sound mind" and gifted two vehicles to Francis and to her son.

On June 3, 2021, the listing for the Lakeport house lapsed.

On June 9, 2021, decedent passed away at the age of 72.

---

[2] Davis's uncontradicted testimony is that "the house" refers to the Lakeport house.

[3] Several accounts are crossed out with notes, such as "this acct is closed" or "gone."  Also, the date "11-1-2020" is scratched out and replaced with "2-5-21."  Davis assumes that decedent made the changes but did not observe him doing so.

[4] Davis testified that the meeting occurred on May 13, despite the notation she added to page 9:  "per Dad 5/16/21."

[5] The meeting included Davis and Lopez and their partners; Francis and her brother; and Francis's son and his partner.

4

## B. Probate Proceedings

On September 21, 2021, over three months after decedent's passing, Davis and Lopez (together, petitioners) filed a verified "Petition for Order Confirming Trust" pursuant to inter alia Probate Code[6] sections 850 and 17200 (the September petition). Petitioners asserted a claim for elder abuse, alleging that Francis used "intimidation and coercion tactics to make decedent transfer his assets to her and her family." Petitioners sought relief "including but not limited to" a declaration that page 9 was "void and of no legal effect" and the return of the monetary gifts and cars that decedent gave to Francis and her son before decedent's death.

On November 19, 2021, Davis, as successor trustee, deeded the Lakeport house to herself and Lopez, as beneficiaries, and recorded the deed on November 30, 2021.

On December 10, 2021, Francis answered the September petition, denying the allegations and asserting multiple affirmative defenses.

On July 25, 2022, Francis filed a verified petition for instructions pursuant to section 17200 (the July petition). The July petition alleged that page 9 modified the 2020 trust and sought its prescribed sale of the Lakeport house and the distribution of 10 percent of the net proceeds to Francis because "Davis has refused to sell the property."

Petitioners and Francis stipulated to consolidate the September petition and the July petition and proceeded to a five-day bench trial in December 2022. Judgment was entered on April 25, 2023, after the filing of closing argument briefs. The judgment denied petitioners' September petition "in its entirety" and declined to order the return of money and property, finding no evidence of elder abuse.

---

[6] All further undesignated statutory references are to the Probate Code.

5

As for the effect of page 9, raised in both the September petition and Francis's July petition, the court found, "[i]t is clear that [decedent] was concerned about taking care of Francis after he died." The court further explained, "given the trajectory of [decedent's] bequests to Francis and the price he expected to get for the Lakeport house that he intended to leave her $350,000 for her maintenance and maintenance of the home he had already deeded to Francis." Therefore, the court ordered the trust to pay Francis "$350,000, which is consistent with the intent of [decedent] or sell the Lakeport House and give Francis 10% of the net proceeds, within 90 days of the date of this decision."

Petitioners moved for a new trial and to vacate the judgment. The trial court denied petitioners' motions but modified its judgment to reduce the payment amount from $350,000 to $331,550, to account for the listing fees, i.e., the "net" proceeds.

Petitioners timely appealed.

## DISCUSSION

On appeal, petitioners challenge the trial court's judgment on two grounds.[7] First, they dispute the determination that page 9 amends the 2020 trust. Alternatively, petitioners argue that even if page 9 amends the trust, the sale of the Lakeport house is a condition precedent to the obligation to pay Francis 10 percent of the net proceeds. Second, petitioners challenge the trial court's jurisdiction to order the sale of the Lakeport house.

As explained below, we interpret page 9 to amend the 2020 trust and require the sale of the Lakeport house and the distribution of 10 percent of the net proceeds to Francis. We reject petitioners' contention that the trial

---

[7] Except for their request to deem page 9 void, petitioners do not challenge the court's denial of their September petition.

6

court did not have jurisdiction to make orders concerning the sale of the Lakeport house and the related distribution of proceeds. However, we agree with petitioners' argument that the sale of the Lakeport house is a condition precedent to the distribution of funds to Francis. For that reason, we remand for further proceedings to determine the timing and manner of the sale of the Lakeport house.

## I.  Whether Page 9 Amends the Trust

"The interpretation of a will or trust instrument presents a question of law unless interpretation turns on the credibility of extrinsic evidence or a conflict therein." (*Burch v. George* (1994) 7 Cal.4th 246, 254 [citing cases], superseded by statute on other grounds as stated in *Estate of Rossi* (2006) 138 Cal.App.4th 1325, 1331–1332, 1339.) At trial, the testimony was consistent that decedent was of sound mind and capable of creating a testamentary instrument. In this appeal, the parties do not challenge the credibility of the witnesses or otherwise dispute the validity of the 2020 trust. Indeed, as the court stated in its judgment, "there was very little disagreement about the 'facts' " during trial. Because there are no questions of credibility or conflicts in evidence, we apply a de novo standard of review in construing page 9 and the trust.

### A.  Amending the 2020 Trust

Petitioners argue that there is "no evidence that [decedent] intended page 9 to be an amendment to his Trust." On the other hand, Francis argues that page 9 is an instrument within the meaning of section 45, and thus decedent's intent should be discerned from page 9 alone. We conclude that page 9 amends the 2020 trust and ascertain decedent's intent by applying settled rules of construction.

7

"The Probate Code governs the revocation and modification of trusts." (*Haggerty v. Thornton* (2021) 68 Cal.App.5th 1003, 1008, affd (2024) 15 Cal.5th 729.) "Unless the trust instrument provides otherwise, if a trust is revocable by the settlor, the settlor may modify the trust by the procedure for revocation." (§ 15402.) Pursuant to the Probate Code, a revocable trust may be revoked by the settlor by "a writing, other than a will, signed by the settlor . . . and delivered to the trustee during the lifetime of the settlor . . . ." (§ 15401, subd. (a)(2).)

The 2020 trust states that it may be amended during the decedent's life "by an instrument in writing signed by Settlor." Thus, the trust governs amendment because it sets forth an amendment process that is different from the statutory procedure, i.e., the trust does not require delivery of the amendment to the trustee as required by section 15401. (*Haggerty v. Thornton* (2024) 15 Cal.5th 729, 741 ["the statutory method is available for modification unless the trust instrument 'provides otherwise' by expressly precluding it or by explicitly making a different procedure exclusive"].)

Here, decedent followed the procedure for amending the 2020 trust as set forth therein; that is, decedent prepared and signed a written document. Petitioners argue that decedent "did not deliver [page 9] to his successor trustee, [Davis], with the same formalities that he delivered his amended and restated trust documents"; however, it is undisputed that decedent did, in fact, deliver page 9 to Davis. Not only did Davis acknowledge receipt, but Davis also assisted decedent in amending page 9. Because decedent followed the amendment procedure set forth in the 2020 trust, and Davis, as successor trustee, cooperated with that procedure, decedent did not need to also comply with the Probate Code's delivery requirement. (§ 15401, subd. (a)(2).)

8

Petitioners next argue that "Page 9 is nothing more than an expression of [decedent's] desire" to make a gift, and as such, "it is not a testamentary gift," and "it does not survive [decedent's] death." We interpret petitioners' argument as characterizing page 9's verbiage as "precatory." Precatory words[8] generally will not create a trust " 'unless it appear[s] that the testator intended to impose an imperative obligation and to exclude the exercise of discretion on the part of the person to whom the recommendatory words are addressed.' " (*Estate of Browne* (1917) 175 Cal. 361, 362, quoting *Estate of Purcell* (1914) 167 Cal. 176, 176–179.) But "when words of recommendation, request and the like are used in direct reference to the estate, they are *prima facie* testamentary and imperative and not precatory." (*Estate of Lawrence* (1941) 17 Cal.2d 1, 7; see also *Estate of Beauchamp* (1967) 256 Cal.App.2d 563, 567–568.)

Page 9 does not contain precatory language, and it was delivered to Davis as the successor trustee, which is prima facie evidence that decedent intended page 9 to have testamentary effect. Further, page 9 affords the successor trustee no discretion in deciding whether or not to sell the Lakeport house or the amount to pay Francis, i.e., 10 percent of the net proceeds. To construe page 9 only as an expression of present intent would render page 9 a nullity, which we strive to avoid. (§ 21120; see also *Estate of Cairns* (2010) 188 Cal.App.4th 937, 948.)

Therefore, we conclude that page 9 amends the 2020 trust.

---

[8] By definition, "precatory words" are "expressions of requests, desires, or recommendations, as distinguished from commands." (Black's Law Dict. (12th ed. 2024) p. 1424, col. 2 [precatory word: "Generally, precatory words are not recognized as legally enforceable instructions"].)

9

## B. Construction of the Amendment

The parties agree that decedent's intent controls the legal effect of page 9. (§ 21102, subd. (a).) Therefore, having determined that page 9 amends the 2020 trust, "we seek to ascertain the grantor's intent by the language of the document as of the time he signed it." (*Blech v. Blech* (2018) 25 Cal.App.5th 989, 1003, citing *Estate of Helfman* (1961) 193 Cal.App.2d 652, 655.)

The intent of the trustor must be ascertained from the whole of the trust instrument, not just its separate parts. (*Estate of Cairns, supra*, 188 Cal.App.4th at p. 944.) " '[T]he court is not limited to determining what is meant by any particular phrase but may also consider the necessary implication arising from the language of the instrument as a whole.' " (*Ammerman v. Callender* (2016) 245 Cal.App.4th 1058, 1074, quoting *Brock v. Hall* (1949) 33 Cal.2d 885, 890.) Thus, "if the meaning of any part of an instrument is ambiguous or doubtful, 'it may be explained by any reference to or recital of that part in another part of the instrument.' " (*Blech v. Blech, supra*, 25 Cal.App.5th at p. 1002, quoting § 21121.) "In interpreting a document such as a trust, it is proper for the trial court in the first instance and the appellate court on de novo review to consider the circumstances under which the document was made . . . ." (*Wells Fargo Bank v. Marshall* (1993) 20 Cal.App.4th 447, 453; see also § 21102, subd. (c).)

Applying the foregoing rules of construction, page 9 demonstrates decedent's intent to amend the 2020 trust to provide for Francis. First, we find nothing ambiguous about the language of page 9 itself. Decedent intended for Francis to receive annual payments of $4,000 while the Lakeport house remained for sale. Once the Lakeport house sold, the annual payments

would stop, and Francis would receive 10 percent of the net proceeds as a lump sum. Then, Francis "will be on her own from this point forward."

This interpretation is consistent with the 2020 trust as a whole and the surrounding circumstances. (*Estate of Cairns, supra,* 188 Cal.App.4th at p. 948; *Wells Fargo Bank v. Marshall, supra,* 20 Cal.App.4th at p. 453.) The 2020 trust devises the Clovis house to Francis "free and clear from the Trust," along with instructions that the trust "pay the real property tax for the fiscal year in which the Settlor dies." However, prior to creating page 9, decedent removed the Clovis house from the trust and deeded it to Francis and himself as joint tenants. Thus, page 9 is consistent with decedent's intent that the trust pay expenses related to the Clovis house. Indeed, Davis testified that decedent explained the $4,000 annual payment was to cover property taxes for the Clovis house.

Perhaps the strongest indicator of decedent's intent is the listing of the Lakeport house for sale in June of 2020. Petitioners argue that because the 2020 trust does not explicitly direct the Lakeport house to be sold and the listing lapsed before decedent's death, Davis properly transferred the Lakeport house to herself and Lopez rather than proceed with its sale. This self-serving argument is contrary to the express language of page 9 and decedent's demonstrated intent. The 2020 trust did not need to direct the Lakeport house to be sold because at the time of its amendment by page 9, the Lakeport house was already listed for sale.

Moreover, the sale listing lapsed a mere six days before decedent's June 9 passing. Although the witnesses testified that in the weeks before his passing decedent was "very coherent," "lucid," and had full mental capacity, at the time the listing lapsed, decedent was either in a wheelchair or bedbound and was receiving hospice care. As the trial court found, decedent

11

"had reached a point in his illness that family was not capable of taking care of him without help." Thus, it is unsurprising that decedent did not renew the listing in his final days. To suggest the listing lapse in the six days preceding decedent's passing demonstrates a dramatic shift in decedent's intent is contradicted by the expansive record. Ultimately, page 9 evinces a clear intent to provide for Francis and includes unambiguous instructions that Francis receive 10 percent of the net proceeds from the sale of the Lakeport house.

## II. Whether Page 9 Contains a Condition Precedent

On appeal, petitioners raise a new, alternative argument that even if page 9 amends the 2020 trust to benefit Francis, the sale of the Lakeport house is a condition precedent to the transfer of 10 percent of the proceeds from the sale. Thus, petitioners argue the trial court's order of a $331,550 payment within 90 days of judgment was "purely speculative" and improper.

A reviewing court "will ordinarily not consider claims made for the first time on appeal which could have been but were not presented to the trial court." (*Newton v. Clemons* (2003) 110 Cal.App.4th 1, 11.) However, a reviewing court retains discretion to address legal arguments not put before the trial court. (*Bialo v. Western Mut. Ins. Co.* (2002) 95 Cal.App.4th 68, 73.) Here, we elect to consider petitioners' argument because we construe the 2020 trust and page 9 de novo, the parties do not raise any evidentiary disputes, and resolving this issue will assist the trial court in effectuating decedent's intent.[9] (*Nguyen v. Applied Medical Resources Corp.* (2016) 4 Cal.App.5th 232, 258 [considering construction argument not raised below

---

[9] We also note Francis does not contend that petitioners waived or forfeited the argument by failing to raise it below.

12

where "defendant has not identified any conflict in the evidence"] citing *People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 901 & fn. 5.)

"A 'condition precedent is either an act of a party that must be performed or an uncertain event that must happen before the contractual right accrues or the contractual duty arises.' " (*Estate of Jones* (2022) 82 Cal.App.5th 948, 953, rehg. den. (Sept. 15, 2022), review den. (Nov. 30, 2022), quoting *Platt Pacific, Inc. v. Andelson* (1993) 6 Cal.4th 307, 313.) "Conditions precedent may be created either expressly—by words such as 'subject to' or 'conditioned upon'—or impliedly," but in either case, conditions precedent are disfavored and strictly construed against the proponent. (*Estate of Jones*, at p. 953 [citing cases].)

In determining whether the sale of the Lakeport house is a condition precedent to the payment of 10 percent of the net proceeds to Francis, we look to an analogous situation discussed by our colleagues in Division Three in the *Estate of Jones*, *supra*, 82 Cal.App.5th 948. There, in connection with a petition for interest in an estate, the parties entered into a settlement agreement that stated in part, "the trust 'shall pay to [Grays-Jones] a total of $3,000,000 . . . as her full and final settlement of [Grays-Jones's] interest in the Estate. Payment of said amount shall be paid to [Grays-Jones] out of the escrow from the sale of the [property].' " (*Id.* at p. 951.) When the sale of the property "fell through," Grays-Jones filed a petition to enforce the stipulated judgment, which the trial court denied as unenforceable after finding "the sale of the property was a condition precedent to [the trustee] owing Grays-Jones $3 million." (*Id.* at pp. 952–953.)

The Court of Appeal reversed, finding the stipulated judgment enforceable. (*Estate of Jones*, *supra*, 82 Cal.App.5th at pp. 953–954 [applying a de novo standard of review].) The court reasoned that the agreement

13

contained "two related—but independent—promises." (*Id.* at p. 953.) The first promise, which uses "shall," "recites an unequivocal promise that the trust will pay Grays-Jones $3 million." (*Ibid.*) The second promise "specifies the *method of payment*." (*Ibid.*) The court determined that specifying the method of payment did not make the first promise contingent on the second. (*Ibid.*)

Instead, the Court of Appeal focused on the timing of performance, i.e., payment, and agreed with the trial court's finding of "an implied condition precedent—escrow closing on the sale of the property—to the trust *paying* the remaining money." (*Estate of Jones*, *supra*, 82 Cal.App.5th at p. 954.) In other words, "the sale of the property was a condition precedent, the satisfaction of which triggered [the trustee's] obligation to pay the remaining $2.85 million to Grays-Jones from the escrow account." (*Ibid.*) As the property had not yet been sold, the Court of Appeal remanded the case "for the court to exercise its inherent authority to enforce the stipulated judgment, including, where appropriate, making determinations regarding breach and excuse from performance." (*Id.* at pp. 954–955 ["Courts have enforced payment obligations even when payment must be made from a specific fund that has not yet materialized"].)

Here too, page 9 creates an unequivocal obligation for the trust to pay Francis 10 percent of the net proceeds from the sale of the Lakeport house, even though the Lakeport house had not sold at the time of decedent's passing. Because both the amount and source of payment set forth in page 9 are contingent upon the sale of the Lakeport house, the sale of the Lakeport house is an implied condition precedent to the payment of funds mandated by page 9. Until that condition is satisfied or excused, the trust's obligation to

14

pay Francis 10 percent of the net proceeds pursuant to page 9 is not enforceable.[10]

Having found the sale of the Lakeport house is a condition precedent to the 10 percent payment to Francis set forth on page 9, we address the trial court's authority to issue the orders in its 2023 judgment.

### III. Whether the Trial Court Acted Within its Authority

In contending that the trial court lacked authority to order the sale of the Lakeport house, petitioners make two arguments. First, petitioners argue that Francis petitioned pursuant to section 17200, which "does not authorize the relief granted by the trial court." Second, petitioners assert that because Davis, as successor trustee, conveyed title to Lakeport house to herself and Lopez prior to trial, the trial court "lacked the authority to order the property sold when it was no longer an asset held by the Trust." We find petitioners' arguments without merit.

Section 850 authorizes "any interested person" to file a petition for court intervention where "the trustee is in possession of, or holds title to, real or personal property, and the property, or some interest, is claimed to belong to another." (§ 850, subd. (a)(3)(A).) Section 850 " 'provides the probate court with a mechanism to determine rights in property belonging to a decedent or to someone else. [Citation.]' " (*Dudek v. Dudek* (2019) 34 Cal.App.5th 154, 170–171, quoting *Estate of Kraus* (2010) 184 Cal.App.4th 103, 117–118.)

Section 17200, on the other hand, authorizes petitions "concerning the internal affairs of the trust or to determine the existence of the trust." (§ 17200, subd. (a).) When presented with a petition pursuant to section

---

[10] Although the record does not reflect whether annual payments required by page 9 have been made since decedent's passing, that payment issue is not before us on appeal.

15

17200, " 'the probate court has a duty *imposed by law* to inquire into the prudence of the trustee's administration.' " (*Schwartz v. Labow* (2008) 164 Cal.App.4th 417, 427 [citing cases].)  "To preserve the trust and to respond to perceived breaches of trust, the probate court has wide, express powers to 'make any orders and take any other action necessary or proper to dispose of the matters presented' by the section 17200 petition."  (*Ibid.*, citing § 17206.)  "More important, the probate court has the '*inherent power* to decide all incidental issues necessary to carry out its express powers to supervise the administration of the trust.' " (*Schwartz*, at p. 427, citing *Estate of Heggstad* (1993) 16 Cal.App.4th 943, 951.)

Here, the July petition seeks an order compelling the sale of the Lakeport house and delivery of 10 percent of the net proceeds to Francis pursuant to page 9.  The July petition echoes the affirmative defenses Francis raised in her answer to the September petition wherein petitioners sought an order "confirming Trust assets" and declaring page 9 void under section 850.  The petitions are "opposite sides of the same coin," and it "is of no legal significance" that Francis sought relief pursuant to section 17200 instead of section 850.  (*Estate of Heggstad*, *supra*, 16 Cal.App.4th at pp. 952, 953 [rejecting the argument that a probate court "cannot resolve the legal status of disputed trust property" pursuant to a section 17200 petition].)

Moreover, Davis cannot defeat jurisdiction by transferring the Lakeport house out of the trust after initiating litigation.  In filing the September petition to confirm trust assets, petitioners sought to have the entirety of page 9 declared "void and of no effect"—"including but not limited to" the payment of "ten percent (10%) of the net proceeds from the sale of the 'house' "—thereby placing the Lakeport house at issue.  Thus, by filing the September petition, petitioners submitted to the jurisdiction of the court and

16

"impliedly consented to jurisdiction in any action related to the action it brought." (*Sea Foods Co., Ltd. v. O.M. Foods Co., Ltd.* (2007) 150 Cal.App.4th 769, 786.) Once jurisdiction attaches, "jurisdiction continues over the parties and the subject of the proceedings . . . until the conclusion of the action or proceeding concerning the trust." (Cal. Law Revision Com. com. to § 17004, citing *Maloney v. Maloney* (1944) 67 Cal.App.2d 278, 280 ["Plaintiff cannot question the jurisdiction which by his own act he conferred," "which attached at the time the suit was filed"].) Here, jurisdiction attached when petitioners filed their September petition, at which point the Lakeport house was a trust asset. Davis's subsequent property transfer does not divest the court of authority over the Lakeport house, particularly when, as petitioners argue and this court agrees, the sale of the Lakeport house is a condition precedent to the 10 percent payment obligation set forth in page 9.

Having disposed of petitioners' jurisdictional challenge, we turn to the substance of the court's judgment. Petitioners contend that the trial court's finding that page 9 entitles Francis to $331,550 "lacks evidentiary support" and "contradicts the terms" of the trust. We disagree with petitioners' characterization; however, based on our interpretation above, the terms of the judgment require remand.

As discussed, petitioners did not raise their condition precedent argument before the trial court, thus, the trial court did not consider or take evidence on the issue. After the trial court's initial judgment, which ordered that "the Trust pay Francis $350,000 . . . or sell the Lakeport house and give Francis 10% of the net proceeds within 90 days of the date of this decision," petitioners filed posttrial motions, arguing that 90 days was insufficient time for sale and that the court provided "no explanation . . . as to why 90 days was selected." At the related hearing, the trial court did not expound on its

17

judgment or address petitioners' argument regarding timing.[11]  However, the court acknowledged that there was no evidence regarding the actual "sale price" of the Lakeport house or how much the net proceeds would be.[12]  Where an instrument "does not fix a time for payment, '[r]easonable diligence and good faith must be required in such instances and it is the duty of the court to hear evidence and therefrom fix a time which would be fair.' " (*Estate of Jones*, *supra*, 82 Cal.App.5th at pp. 954–955, quoting *Pitzer v. Wedel* (1946) 73 Cal.App.2d 86, 91.)

Absent evidence of the condition and readiness for sale of the Lakeport house, as well as any related diligence and good faith efforts of petitioners, we have no ability to assess the reasonableness of the trial court's 90-day order for sale.  Therefore, we remand for further proceedings to allow the trial court to exercise its inherent authority to effectuate the will of the decedent, including providing for the timing and manner of the sale of the Lakeport house or whatever reasonable and good faith alternatives are evidentiarily supported.

## DISPOSITION

The April 25, 2023 judgment after bench trial, as amended by the July 5, 2023 minute order, is affirmed in part and reversed in part.  The judgment is affirmed insofar as it denies the September petition and reversed insofar as it compels the sale of the Lakeport house or monetary payment to Francis

[11] Although petitioners complain that "no Statement of Decision was prepared by the trial court," the record shows that after an exchange with counsel, the trial court agreed not to reformulate its judgment into a statement of decision so petitioners could appeal directly.

[12] "It was expressed in testimony that [decedent] expected (perhaps overconfidently) to receive that price for the home."  An appraisal report by the probate referee marked as petitioners' exhibit 7 listed an appraisal value of $2,790,000.

18

within 90 days of the judgment.  We remand with directions for the trial court to conduct further proceedings consistent with its inherent authority to manage the sale of the Lakeport house, including, if necessary, the authority to order payment in lieu of sale if supported by evidentiary findings concerning feasibility, reasonable diligence, or good faith.

In the interests of justice, the parties shall bear their own costs of appeal.  (Cal. Rules of Court, rule 8.278(a)(5).)

_____
DESAUTELS, J.

We concur:


_____
STEWART, P.J.


_____
RICHMAN, J.


*Davis v. Francis* (A168299)