Filed 9/8/22  Fisher v. Fisher CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| TODD A. FISHER, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> KENT N. FISHER et al., <br><br> Defendants and Respondents; <br><br> CRONAN FORREST FISHER et al., <br><br> Defendants and Appellants. | D078019 <br><br><br> (Super. Ct. No. 37-2017-00011505-PR-TR-CTL) |

APPEAL from orders of the Superior Court of San Diego County, Julia Craig Kelety, Judge.  Affirmed.

Mazzarella & Mazzarella, Mark C. Mazzarella and E. Todd Trumper for Plaintiff and Appellant.

Beamer, Lauth, Steinley & Bond and Stephen A. Bond for Defendants and Appellants.

Van Dyke & Associates, Richard S. Van Dyke and Vincent J. Russo for Defendants and Respondents.

Leonard Fisher drafted his trust so that, when viewed in isolation, it would leave the bulk of his estate in unequal portions to his four sons, with

certain funds going to education and medical sub-trusts for his grandchildren and heirs. But Leonard coordinated the drafting of his trust with the drafting of his ex-wife Gale's trust. Although her trust, when viewed in isolation, would also leave their sons unequal portions, the two trusts *when viewed together* would collectively leave the sons roughly equal gifts. Leonard's and Gale's trusts were revocable and not legally binding on each other.

When Leonard died before Gale in 2014, his trust was missing significant anticipated assets, making it impossible to administer as written. Accordingly, one son, Kent, brought a petition in 2017 seeking instructions to liquidate its assets and use the proceeds to fund the sub-trusts and then divide the remaining funds equally among the four sons. Another son, Todd, then brought a petition seeking to delay administration of Leonard's estate until after Gale died so that their trusts could be administered together and the sons would receive roughly equal portions collectively from their parents' trusts (rather than equally from Leonard's estate). Todd also argued Kent's petition was an untimely trust contest because it was not brought within 120 days of notice of Leonard's death. (Prob. Code, § 16061.8.)[1] The guardian ad litem for Leonard's grandchildren, who are beneficiaries under the education and medical sub-trusts, sided with Kent and favored the immediate distribution of trust assets and funding of the sub-trusts.

Following a bench trial in 2020, the probate court rejected Todd's untimeliness challenge, finding Kent's petition was not a trust contest, but rather, sought instructions on how to administer Leonard's trust. The court granted Kent's petition in part and ordered the trustee to liquidate the trust's assets and distribute the proceeds equally among the four sons. The court

---

[1]     Further undesignated statutory references are to the Probate Code.

2

concluded that because the trust contained fewer assets than Leonard had anticipated, the specific gifts to the sons' portions would take priority over the general gifts to the sub-trusts such that the latter would abate and go unfunded.

Todd appeals, contending the probate court erred in finding Kent's petition was not an untimely trust contest, and exceeded its authority in liquidating and evenly distributing Leonard's trust assets. Neither contention has merit. As we will explain, the probate court and all parties agreed that unknown and unanticipated circumstances rendered Leonard's trust impossible to administer as written. Under the circumstances, the probate court properly found Kent's petition was not a contest, and the court acted within its authority in modifying the trust as it did.

The guardian ad litem, attorney Stephen Bond, also appeals. He maintains the probate court erred by classifying the sons' portions as specific gifts entitled to statutory priority over the general gifts to the sub-trusts, rather than as residuary gifts subordinate to the sub-trusts. We disagree. The probate court property classified Leonard's gifts to the sons' portions as specific gifts because they gave specific property to specific people. (§ 21117, subd. (a).) The court also properly applied the statutory order of abating gifts (§ 21402), which was not overcome by any clear contrary intent of Leonard (§ 21400).

Accordingly, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Leonard Fisher (Leonard) and Gale Fisher Ostlind (Gale) were married and had four sons together: Brittin, Todd, Kent, and Wade (who apparently died after trial). Kent has one child; Brittin has three children; and Todd and

3

Wade have no children. Leonard and Gale divorced sometime before April 2014.

In April 2014, Leonard and Gale consulted the same attorney, Paul McEwan, to update their respective estate plans.

### A. *Leonard's Trust*

On April 16, 2014 Leonard executed the Leonard F. Fisher Declaration of Trust dated February 20, 2014 (Leonard's Trust). Schedule A listed the trust's initial assets, which consisted of three pieces of real property, "[v]arious bank accounts," and a "United B Fund Account."[2] Schedule B set forth how those assets were to be distributed upon Leonard's death.

### 1. Education Sub-trust

Paragraph 1 of Schedule B provided for the establishment and partial funding of a sub-trust "for the educational benefit" of Leonard's grandchildren (the Education Sub-trust). This paragraph directed the trustee to "set aside assets with a total value of . . . $300,000," to be derived from a "one-third (1/3) interest in [a $900,000] Promissory Note to be created" in connection with the division of Leonard's remaining estate among his sons. Paragraph 1 further stated that "[i]t is anticipated that an additional . . . $250,000 from the estate of [Gale] will be added to this trust at the time of her demise."

### 2. Medical Sub-trust

Paragraph 2 of Schedule B provided for the establishment and funding of a sub-trust "for the catastrophic medical care and health needs" of all of Leonard's issue. This paragraph directed the trustee to "set aside the sum of . . . $550,000," to be derived from $250,000 from the United B Fund and

---

[2]  The appellate record contains a handwritten spreadsheet that appears to show the estimated value of each item in Leonard's and Gale's respective estates at the time their trusts were prepared (the Spreadsheet).

4

$300,000 from the $900,000 promissory note to be created in connection with the division of Leonard's remaining estate among his sons.

### 3. The Four Portions

Paragraph 3 of Schedule B directed that, "[a]fter the [Education and Medical Sub-trusts] have been established, . . . the Trustee shall divide the remaining assets to be disposed of under . . . Schedule 'B' into four . . . separate portions."[3]  Paragraph 3 continues, "Each of the four . . . separate portions shall contain the assets specified below."

The four portions are summarized as follows:

Portion 1:

- 100% interest in a duplex on Island Ct.;
- $50,000 in cash; and
- 50% interest in the United B Fund.[4]

Portion 2:

- 50% interest in Leonard's bank accounts;[5] and
- One-third interest in the $900,000 promissory note payable by the recipient of Portion 4.

---

[3]    Paragraph 3 of Schedule B states in part:  "After the trust specified in paragraphs 1. and 2. above have been established, and after the payments of any federal estate taxes and other costs incurred in the settlement of the estate of the Trustor have been made, the Trustee shall divide the remaining assets to be disposed of under this Schedule 'B' into four (4) separate portions using values as of the date of the demise of the Trustor, after deducting any federal estate tax and other costs incurred in the settlement of the estate of the Trustor, and after establishing a reserve cash account in an amount to be determined by the Successor Trustee to cover any expenses of the estate that might occur after the establishment of the four (4) separate portions."

[4]    According to the Spreadsheet, the United B Fund had an estimated value of $500,000.

[5]    According to the Spreadsheet, Leonard had about $200,000 in his bank accounts.

Portion 3:

- 100% interest in real property on Coast Blvd.; and
- 100% interest in a duplex on Isthmus Court.

Portion 4:

- 50% interest in Leonard's bank accounts; and
- 100% liability on a new $900,000 promissory note payable by the recipient of Portion 4 in equal parts to the Education Sub-trust, the Medical Sub-trust, and the recipient of Portion 2.

It is undisputed that these portions, in isolation, were unequal in value when Leonard prepared his trust. According to the Spreadsheet, Portion 1 was worth $587,300; Portion 2 was worth $400,000; Portion 3 was worth $1,659,000; and Portion 4 was worth *negative* $800,000.

Paragraph 4 of Schedule B specified that each of the four sons was to receive one of the four specified portions.[6] Paragraph 5 provided that the assignment of portions to sons was to be determined by drawing numbered straws, unless straws had already been drawn under Gale's trust, in which case the portion numbers assigned by that drawing would similarly apply to the numbered portions in Leonard's Trust.

## B. *Gale's Trust*

Two days after Leonard executed his trust, Gale executed "Amendment No. 2 to the Gale B. Fisher Ostlind Trust [formerly known as the Gale B. Fisher Trust] dated April 17, 1997" (Gale's Trust).

As with Leonard's Trust, Schedule A to Gale's Trust set forth the trust's initial assets, which included two residences, two commercial properties, a farm in Illinois, unimproved real property in Oregon and Nevada, "[v]arious cash accounts," and "[v]arious securities accounts." Also

---

[6] Paragraph 4 limited Brittin's access to his share of trust assets if his unsecured debts exceeded a certain threshold.

6

as with Leonard's Trust, Schedule B to Gale's Trust set forth how those assets were to be distributed upon Gale's death.

Paragraph 1 directed the trustee to "distribute securities with a value of . . . $250,000" to the Education Sub-trust established under Leonard's Trust.

Paragraph 2 mirrored the provision in Schedule B to Leonard's Trust providing for the division of remaining assets into four separate portions. The four portions are summarized as follows:

Portion 1:

- 100% interest in a residence on Harbor View Drive;
- 100% interest in a residence in Indian Wells;
- 100% interest in the Illinois farm;
- 10% interest in Gale's securities accounts; and
- 100% interest in the Oregon and Nevada properties.

Portion 2:

- 100% interest in commercial real property on Lincoln Avenue in San Rafael.

Portion 3:

- 100% interest in Gale's cash accounts; and
- 90% interest in Gale's securities accounts.

Portion 4:

- 100% interest in commercial real property on 4th Ave. in San Rafael.

It is undisputed that these portions, in isolation, were unequal in value when Gale prepared her trust. According to the Spreadsheet, the estimated value of Portion 1 was $1,655,000; Portion 2 was $1,900,000; Portion 3 was $550,000; and Portion 4 was $3,100,000.

Schedule B to Gale's Trust also mirrored the provisions in Schedule B to Leonard's Trust with respect to designating their four sons as beneficiaries

and assigning them portions by drawing straws (unless straws had already been drawn under Leonard's Trust, in which case the portion numbers assigned by that drawing would similarly apply to the numbered portions in Gale's Trust).

Although unequal when considered separately, the corresponding portions in Schedule B to Leonard's and Gale's respective trusts were roughly equal when combined. Thus, per the Spreadsheet, the estimated value of the *combined* Portion 1's was $2,242,300; Portion 2's was $2,300,000; Portion 3's was $2,209,000; and Portion 4's was $2,300,000.

## C. *Leonard's Death, Drawing Straws and the Competing Petitions*

On June 13, 2014, about two months after he executed his trust, Leonard died. Todd began serving as successor trustee of Leonard's Trust, and served interested parties with a notice under section 16061.7 that the trust had become irrevocable.

In July 2014, Leonard's sons drew straws, which resulted in the following portion assignments: Kent was assigned Portion 1; Wade was assigned Portion 2; Todd was assigned Portion 3; and Brittin was assigned Portion 4.

### 1. Kent's Petition

More than three years after Leonard's death, in September 2017, Kent filed a petition to (1) remove Todd as trustee; and (2) obtain "instructions to [the] trustee re[garding] proposed distributions and funding of sub-trusts." Only the latter aspect is at issue in this appeal.

In his petition, Kent "request[ed] that the Court modify or terminate [Leonard's] Trust" because its "terms . . . as written are impossible to

administer."[7]  Kent alleged the trust had become impossible to administer because the anticipated funding sources for the Education and Medical Sub-trusts were unavailable.  Specifically, each sub-trust was to receive $300,000 from the $900,000 promissory note to be created by the recipient of Portion 4.  However, because the recipient of Portion 4 would receive from Leonard's estate only an $800,000 *liability*, Kent alleged "it is highly probable that the son receiving Portion 4 will disclaim the 'gift' of the Promissory Note liability or disclaim the entire gift encompassed within Portion 4."

Additionally, although the Medical Sub-trust was to be funded with an additional $250,000 from Leonard's United B Fund, Kent alleged "the United B Fund Account was not a Trust asset at the time of death, so it likewise cannot be used to fund the Medical . . . Sub-trust."

Kent alleged that, without the promissory note and United B Fund, the assets in Leonard's Trust at the time of death consisted of about $167,000 in cash accounts and three real properties valued at about $3.5 million.[8]  Given that the trust's assets were "substantially different" than Leonard anticipated, Kent alleged the trust "is clearly a defective Trust that should be modified by the Court under Probate Code section 15409."

As for how to modify the trust, Kent alleged Leonard "intended to equally benefit his children after the distribution of [Leonard's] Trust assets <u>and</u> after the death of and distribution of assets from . . . Gale."  But Kent

---

[7]     Kent alleged he had requested that Todd, as trustee, file a petition for instructions.  Todd did not do so.

[8]     Kent's estimate of the property values as of Leonard's death is consistent with the estimated values of those properties on the Spreadsheet as of the time Leonard's Trust was prepared.  Kent's estimate, however, does not reflect that the Spreadsheet indicates the three properties had mortgage debt totaling $1,553,700, leaving equity of $1,946,300.

advised that Gale had "already changed her Trust assets by deeding one of her Portion 1 assets [assigned to Kent by virtue of drawing straws under Leonard's Trust] valued at $1.6 million to Wade," which not only undermined Leonard's intent but would also "presum[ably]" render Gale's trust administration "similarly defective." "Because [Leonard]'s intent was to benefit his sons equally after the death of both Leonard and Gale, and [because] the terms of the Trust cannot be administered as intended," Kent requested that the court "instruct the Trustee to sell the real properties and us[e] the sales proceeds" to fund the Education and Medical Sub-trusts, with the "remaining Trust assets [to] be distributed equally between the four sons."

Todd, as trustee, objected to Kent's petition as it related to removing and replacing Todd. As relevant here, Todd elaborated on what became of Leonard's United B Fund. Todd explained "it was discovered [after Leonard's death] that the United B Fund named Leonard's four sons as beneficiaries instead of the Trust, resulting in direct distribution of the fund to his sons with each of them receiving $165,000 . . . ." Todd acknowledged that "[b]ecause the United B Fund was not distributed to the Trust, the distribution plan in the Trust became impossible to carry out as written . . . ."

## 2. Todd's Petition

In March 2018, about six months after Kent filed his petition, Todd (in his capacity as trustee) also filed a "petition for instructions re[garding] distribution of trust assets or for modification of trust."

Todd reiterated that, by virtue of the United B Fund not being included as a trust asset, "part of the distribution plan in the Trust became impossible to carry out as written." Todd also acknowledged it was unlikely the recipient of Portion 4 would undertake the liability of a $900,000 promissory

10

note until after Gale died, at which time a commercial real property in San Rafael would be distributed to the Portion 4 recipient. Thus, Todd concluded the sub-trusts and a portion of Portion 1 "cannot be funded as required."

Under the circumstances, Todd argued the court had statutory and equitable authority to modify the trust to implement Leonard's intent. To achieve this, Todd proposed (among other things) delaying funding the sub-trusts and creating the $900,000 promissory note until after Gale's death and distribution of her estate in accordance with her trust.

Kent objected to Todd's petition. Kent noted that he "and Todd (and presumably the other two brothers) agree on one thing, namely that it is impossible to administer and distribute [Leonard's] Trust in accordance with its provisions . . . ." But Kent objected that Todd's proposed modifications were "self-serving, indefinite and very likely unworkable." Kent cited the fact Gale was not legally obligated to coordinate her trust with Leonard's and, in fact, had already acted inconsistently with a coordinated distribution by giving Wade a piece of real property that her trust specified was to go to Portion 1, which was assigned to Kent by drawing straws under Leonard's Trust.

Bond, the guardian ad litem, also filed a report in response to Todd's Petition. Bond opined "Leonard's Trust is plagued by three false assumptions:" (1) that the United B Fund would be a trust asset, (2) the "assumption that a source for payment of a $900,000 note would be provided by Gale's Trust"; and (3) the "larger assumption that the two trusts . . . would continue to act together as a cohesive plan, which assumption was "undermined by the fact that apparently Gale has already modified the distribution of her trust through a substantial lifetime gift that is inconsistent with the plan the two trustors appear to have had in 2014."

Bond opposed Todd's request to delay funding the sub-trusts (of which Bond's wards were beneficiaries) and "any coordination with Gale's Trust." Instead, he proposed "moving forward to complete the administration of Leonard's Trust, on its own terms." Bond stated he "would interpret Leonard's Trust consistent with Kent's Petition . . . ."

### 3. Todd's Individual Filings

After a May 2019 evidentiary hearing, the probate court suspended Todd as trustee and appointed a professional fiduciary to act as trustee. Todd thereafter filed several documents in his individual capacity.

First, Todd filed a joinder in the earlier petition and objection he had filed as trustee.

Second, he filed a proposed petition in intervention seeking similar relief as in his original petition as trustee. Additionally, he sought a judicial declaration that Kent's petition constituted a "contest" to Leonard's Trust that (a) violated a no contest clause in the trust such that Kent's interest under the trust should be "revoked," and (b) was "barred by the statute of limitations" because it was filed more than 120 days after service of appropriate notice of Leonard's death and the trust thus becoming irrevocable. Todd continued to recognize that "part of the distribution plan in [Leonard's] Trust became impossible to carry out as written since the [United] B Funds are now unavailable to fund the Medical Sub-Trust and Portion 1," which "was and is an unforeseen circumstance related to administration of [Leonard's Trust]." He further continued to acknowledge that "the Court in this case has [statutory and equitable] authority to modify the terms of Leonard's Trust in order to carry out the purpose that Leonard intended."

12

Third, Todd filed a petition in his individual capacity seeking (1) to remove the professional fiduciary as trustee and to restore Todd to that role; (2) an "order for distribution that comports with the intent of" Leonard's Trust; and (3) a declaration that Kent's Petition constitutes a contest that "has not been filed timely."[9]  Todd continued to allege that "the Court in this case has [statutory and equitable] authority to modify the terms of Leonard's Trust in order to carry out . . . Leonard's intent."

Kent objected to Todd's petition.  Kent reiterated that he "and Todd (and presumably the other two brothers) agree . . . that it is impossible to administer and distribute" Leonard's Trust as written, but they "vastly" disagree "as to how best to give effect to Leonard's testamentary intentions." Kent argued his petition "is not a contest or attack on the Trust.  Instead, just as Todd has done with his current petition, Kent has sought an instruction to the trustee . . . to resolve the disputes that have arisen over the interpretation and administration of the Trust due to the impossibility of carrying out the terms of the Trust as drafted."

Bond filed a report "favor[ing] the denial of Todd's Petition."  Based again on the "false assumptions" underlying Leonard's Trust, Bond urged the court to order the immediate funding of the Education and Medical Sub-trusts with other trust assets, and then to distribute the remainder of Leonard's Trust assets in equal shares to the four sons.  Bond disagreed with Todd that Kent's petition constituted a "contest" because it did "not seek to invalidate any term of Leonard's Trust," but rather, "it seeks only to identify, and offer potential remedies for, problems arising in the construction and administration of Leonard's Trust, *as written*."

---

[9]    The appellate record does not make clear the relationship between Todd's proposed petition in intervention and his later petition.

## D. *Trial*

The probate court set Kent's petition and Todd's original petition (plus the statute-of-limitations issue raised in his later filings) for trial to be held in August 2020. No witnesses testified at the trial; instead, the court reviewed the parties' petitions, trial briefs, and exhibits (primarily trust documents).[10]

The court began by announcing its tentative ruling was not to fund the Education or Medical Sub-trusts, and to sell the trust's remaining assets and distribute the proceeds equally among Leonard's four sons. The court reasoned that because Leonard's Trust had insufficient assets to satisfy all of its intended gifts, the gifts would "abate" in the order specified in section 21402. As relevant here, "residuary gifts" abate before "general gifts," which abate before "specific gifts." (§ 21402, subd. (a)(4), (6).) The court found the Education and Medical Sub-trusts were *general* pecuniary gifts, and that the four portions were *specific* gifts because they assigned specific real properties, bank accounts, or promissory note proceeds to specific people. The court noted it was "tempting to call the portions residuary gifts" because Leonard's Trust stated they were to be given "after" the sub-trusts were established. But the court found this "timing is just incidental," and the specific character of the portions prevailed. Applying the statutory order of abatement, the court tentatively ruled the sub-trusts (as general gifts) would abate before the four portions (as specific gifts).

---

10    Brittin and Wade appeared at trial but did not actively participate. Wade stated he was "just trying to stay out of the case" and "ha[s] no feelings on it at this point." Brittin stated that his "big issue" was disputing Todd's claim that "Leonard never wanted the kids to sell the property."

The court noted there was also an "ademption issue" because neither the United B Fund nor the proceeds of the $900,000 promissory note were part of the estate, "so those assets would adeem and wouldn't be considered."

Setting aside Leonard's "pretty large misapprehension" about his trust being administered with Gale's, the court found that "the evidence before the court . . . in the trust is that he [was] doing his best, although not in a particularly effective manner, to come up with a way that all four kids would come out . . . pretty equal." To achieve that end, the court tentatively found it was in the best interest of the estate that the "specific gifts . . . be liquidated so that they can be distributed equally."

After hearing extensive argument on behalf of Kent, Todd, and Bond, the court confirmed its tentative ruling and stated it would issue a written order.

Todd's counsel then raised the statute of limitations issue, which the court had not yet addressed. The court rejected the claim, explaining (in part) Kent's petition "wasn't a *challenge* to the trust[,] [i]t was the request that the court *interpret* the trust." (Italics added.) The court added, "to have a contest, you have to have an absence of probable cause," and "there is plenty of probable cause to be trying to modify this trust."

### E. *The Appealed-From Orders*

On August 4, 2020, the court issued two virtually identical minute orders—one denying Todd's petition, the other granting Kent's petition in part. The orders confirmed the court's finding that the gifts to the sub-trusts were general gifts; the bulk of the gifts to the four portions were specific, not residuary, gifts;[11] and, thus, the gifts to the sub-trusts abate.

---

[11] The court found the gift of $50,000 cash to Portion 1 was a general gift.

15

"As to the interpretation of how the specific assets should be distributed in light of the myriad problems with the estate plan," the court stated it was "guided by the Trustor's intent as set forth in the Trust," as informed by "consider[ation] of all parts of the Trust in relation to each other to form a consistent whole." In discerning Leonard's intent, the court stated it was "mindful of certain facts that were not known to [him] in coming up with his estate plan, i.e., (1) that certain assets named in the portions would be unavailable; (2) that his ex-wife's estate planning decisions were subject to change after his death and could not legally be used to affect his estate plan, and (3) that real property would have to be sold to make distribution equitable among the beneficiaries of his specific gifts." Based on these principles, the court found that, although Leonard "had various goals, some of which were unattainable," his "overarching goal was to create a plan that treated his sons equitably, but he erred in thinking that he could incorporate his ex-wife's assets as crucial parts of the plan."

Accordingly, "the court conclude[d] that (1) the subtrusts should not be funded; and (2) the net Trust estate shall be distributed as residue, in equal shares to the four children of the Trustor." To achieve this, the court directed the trustee to "sell all Trust real property forthwith."

Todd and Bond appeal from both orders.

## DISCUSSION

## II.  TODD'S APPEAL

### A.  *Kent's Petition Was Not an Untimely Trust Contest*

Todd contends the probate court erred by denying his request for a judicial declaration that Kent's petition was untimely under section 16061.8 because it was not filed within 120 days of the trustee's notice. Todd argues the court "applied the wrong standard by inserting a 'probable cause' element

16

into the" determination of whether Kent's petition constituted a "contest" for purposes of section 16061.8. Todd maintains probable cause is irrelevant to that determination and is relevant only when a beneficiary is defending against a petition to disinherit that beneficiary for violating a no contest clause. (See § 21311, subd. (a)(1) [providing that a "no contest clause shall only be enforced against" a "direct contest that is brought *without probable cause*," italics added; § 21310, subd. (a) [defining " 'Contest' "].)

We need not resolve the issue of first impression of whether section 21310's definition of *contest* applies to section 16061.8 because, as we will explain, although the probate court referenced probable cause in its ruling, the ruling did not rest on that rationale. Instead, the probate court found more generally that Kent's petition was not a contest because he was merely seeking instruction from the court on how to interpret a trust that all the parties acknowledged had become impossible to administer as written. On the record before us, we reach the same conclusion.

### 1. Background

Leonard's Trust contains a no contest clause that purports to disinherit "any beneficiary" who "should in any manner, directly or indirectly, contest or attack th[e] Trust or any of its provisions."

Todd sought a judicial declaration that Kent's petition constituted a contest to Leonard's Trust that was both time-barred and resulted in a forfeiture of Kent's right to receive anything under the trust.

At trial, the probate court denied Todd's requested relief with the following explanation:

> "I know you made this pitch for that, and I reject that suggestion. Since the first day this case has been before the Court, we have been trying to figure out what this trust means. To have a contest, you have to have an absence of probable cause. Believe me, there is plenty of probable

17

cause to be trying to modify this trust.  This is the trust—everybody saying to the court, help us figure it out.  And, obviously, there is plenty of probable cause for that.  *It wasn't a challenge to the trust.  It was the request that the court interpret the trust.*  So we are not implicating the no contest clause and we are not implicating the statute of limitations."  (Italics added.)

## 2.  Legal Principles

### *(a)  Statute of Limitations*

"A trustee must serve a notification to the beneficiaries and heirs when a revocable trust becomes irrevocable after the settlor of the trust dies.  (§ 16061.7, subd. (a)(1).)"  (*Bridgeman v. Allen* (2013) 219 Cal.App.4th 288, 293 (*Bridgman*).)

"Section 16061.8 sets forth the applicable statute of limitations for petitions that contest a trust."  (*Bridgman, supra*, 219 Cal.App.4th at p. 293.)  This statute provides in part:  "No person upon whom the notification by the trustee is served . . . may bring an action to contest the trust more than 120 days from the date the notification by the trustee is served upon him or her . . . ."  (§ 16061.8.)  The relevant portion of the Probate Code does not define what it means for "an action to *contest* a trust."  (§ 16061.8, italics added.)

The courts, however, have stated that in "determining whether [a petition] constitutes an action to contest [a] trust within the purview of section 16061.8, we look to the substance of that petition and its 'practical effect.'  We are not bound by its label."  (*Estate of Stoker* (2011) 193 Cal.App.4th 236, 241 (*Stoker*).)  "[A]n action challenging the validity of [a] trust" (*ibid.*) or seeking to "thwart or nullify or unravel the testator's express wishes" may be considered a contest (*Estate of Davies* (2005) 127 Cal.App.4th 1164, 1175; see *Stoker*, at p. 240 [finding that a petition to probate a will was

18

a trust contest where the will was executed after the trust at issue and would have completely revoked and replaced the trust]; *Giammarrusco v. Simon* (2009) 171 Cal.App.4th 1586, 1601 (*Giammarrusco*)).

But a petition that does not question the validity of a trust, but rather, seeks only to determine and implement the trustor's express wishes—such as a petition asking the court to construe an ambiguous passage within the trust—is not a contest. (*Giammarrusco, supra,* 171 Cal.App.4th at p. 1602; see *Estate of Black* (1984) 160 Cal.App.3d 582, 588 ["Numerous cases hold that . . . a petition seeking construction or interpretation of a will is [not] a 'contest,' although such proceedings might result in invalidation of certain of the will's provisions."].)

" '[T]he answer cannot be sought in a vacuum.' " (*Burch v. George* (1994) 7 Cal.4th 246, 254 (*Burch*).) Rather, it will depend "upon the individual circumstances of the case and the language of the particular instrument." (*Dae v. Traver* (2021) 69 Cal.App.5th 447, 461 (*Dae*)).

### (b) Probable Cause

Historically, a no contest clause could be enforced against either a direct or indirect contest to a will or trust. (See *Donkin v. Donkin* (2013) 58 Cal.4th 412, 422-423 (*Donkin*).) "A 'direct contest' was defined as a pleading in a court proceeding that alleged 'the invalidity of an instrument or one or more of its terms' based on 10 specified grounds, including . . . revocation, lack of capacity, fraud, undue influence, lack of due execution, and forgery." (*Id.* at p. 423.) "An ' "[i]ndirect contest" ' was defined as a pleading 'that indirectly challenges the validity of an instrument or one or more of its terms based on any other ground not contained in [the statutory list of direct contests].' " (*Ibid.*)

After the law governing no contest clauses had become increasingly complex over several decades, the Legislature simplified the regulatory regime effective January 1, 2010 so that, now, "a no contest clause will only be enforced against a pleading that challenges certain property transfers, a creditor's claim, or '[a] *direct contest that is brought without probable cause.*' " (*Urick v. Urick* (2017) 15 Cal.App.5th 1182, 1193, quoting § 21311, subd. (a)(1), italics added;[12] see *Key v. Tyler* (2019) 34 Cal.App.5th 505, 516 (*Key*); *Donkin, supra,* 58 Cal.4th at pp. 425-426.) The new legislation "preclude[s] the enforcement of no contest clauses against an 'indirect' contest." (*Key*, at p. 516; *Donkin*, at p. 424; see *Giammarrusco, supra,* 171 Cal.App.4th at p. 1615.)

New section 21310 provides: "As used in this part: [¶] (a) " 'Contest'" means a pleading filed with the court by a beneficiary that would result in a penalty under a no contest clause, if the no contest clause is enforced." (§ 21310, subd. (a).)[13] It defines a "Direct contest" as a "contest based on certain specified grounds, such as forgery, lack of due execution or capacity, duress, fraud, or undue influence. (§ 21310, subd. (b)(1)-(6).)

---

[12] Section 21311, subdivision (a) states: "A no contest clause shall only be enforced against the following types of contests: [¶] (1) A direct contest that is brought without probable cause. [¶] (2) A pleading to challenge a transfer of property on the grounds that it was not the transferor's property at the time of the transfer. A no contest clause shall only be enforced under this paragraph if the no contest clause expressly provides for that application. [¶] (3) The filing of a creditor's claim or prosecution of an action based on it. A no contest clause shall only be enforced under this paragraph if the no contest clause expressly provides for that application."

[13] Section 21310 is in part 3 of division 11 of the Probate Code. Section 16061.8 is in part 4 of division 9 of the Probate Code.

### (c) Standard of Review

"The applicability of a statutory standard to undisputed facts and questions of statutory interpretation are questions of law that are reviewed de novo." (*Estate of Wilson* (2012) 211 Cal.App.4th 1284, 1290.) Similarly, the "interpretation of a will or trust instrument presents a question of law unless interpretation turns on the credibility of extrinsic evidence or a conflict therein." (*Burch, supra*, 7 Cal.4th at p. 254; see *Key, supra*, 34 Cal.App.5th at p. 540.)

### 3. Analysis

Based on our de novo review, we conclude the probate court properly found Kent's petition was not a contest subject to 16061.8's 120-day limitation period.

Preliminarily, we reject the factual premise on which Todd bases his claim that the probate court "applied the wrong standard by inserting a 'probable cause' element [from section 21311] into the statute of limitations [in section 16061.8]." Although the probate court referenced probable cause when explaining its finding that Kent's petition did not constitute a contest for statute of limitations purposes, the court's ruling rests more generally on the finding that Kent's petition was not a contest because—in the probate court's words—it "wasn't a *challenge* to the trust," it was a "request that the court *interpret* [a] trust" that the parties acknowledged had become impossible to administer as written. (Italics added.)[14] Based "upon the

---

[14] Even if the probate court applied the wrong legal standard, we would nonetheless affirm because we independently reach the same conclusion as the probate court even without considering whether Kent had probable cause to bring his petition. (See *Blech v. Blech* (2018) 25 Cal.App.5th 989, 999 (*Blech*) ["On appeal, we review the probate court's ruling, not its reasons, and affirm if the ruling is correct albeit the reasons are not; we also resolve any ambiguities in favor of affirmance."].)

individual circumstances of the case and the language of the particular instrument" (*Dae, supra,* 69 Cal.App.5th at p. 461), we agree.

The probate court and the parties universally recognized Leonard's Trust had become impossible to administer as written because (at a minimum) the United B Fund—on which the partial funding of the Medical Sub-trust and Portion 1 depended—was not a trust asset as Leonard had anticipated it would be. Indeed, Todd acknowledged in three probate court filings that the "distribution plan" in Leonard's Trust "became impossible to carry out as written." (See *Donkin, supra,* 58 Cal.4th at p. 434 ["even the successor trustees' own arguments make it plain that the issue in dispute is the proper interpretation of ambiguous provisions of the [trust]"].) Thus, the parties agreed the trustee needed instruction from the court on how to overcome the trust's funding failures.

Yet, Kent did not immediately petition the court for instructions. Instead, he urged Todd—the trustee—to do so. It was only after Todd did not do so that Kent eventually filed his petition.

Todd objected to Kent's petition, but not on the ground it constituted a contest to Leonard's Trust.

For his part, Todd eventually filed several petitions also seeking instructions from the court regarding distribution of estate assets. Surely, Todd does not contend his own petitions constitute contests to Leonard's Trust.

It was not until Todd filed his proposed petition in intervention—about two years after Kent filed his petition—that Todd finally characterized Kent's petition as a trust contest. The probate court could reasonably have inferred Todd viewed Kent's petition as a request for instructions until he believed he

22

could gain a litigation advantage by changing his characterization of the petition.

Under these circumstances, Kent's petition did not (in the language of Leonard's Trust) "directly or indirectly . . . contest or attack" the Trust or any of its provisions. Rather, it sought instruction from the court on how to administer a trust that had become impossible to administer as written. (See *Donkin*, *supra*, 58 Cal.4th at p. 434 ["[D]isputes over the *interpretation* of instruments were not ordinarily seen as violating a no contest clause. 'Rather than thwarting the testator's dispositive intent, the proceeding serves to ascertain and enforce that intent,' " italics added]; *Estate of Black*, *supra*, 160 Cal.App.3d at p. 588 ["a petition seeking construction or interpretation of a will is [not] a 'contest' "].)

Todd maintains Kent's petition was a contest because "Kent called the 'terms of the Trust' *impossible* . . . ." They were! And Todd repeatedly said the same thing in his own court filings. Acknowledging this reality did not mean Kent—or Todd—was contesting or attacking Leonard's Trust.

Todd also argues Kent's petition is a contest because it "specifically asked the court to '*terminate* the Trust.' " (Italics added.) In a vacuum, this sounds somewhat like a "contest" or "attack." But context reveals the "practical effect" (*Stoker*, *supra*, 193 Cal.App.4th at p. 241) of Kent's petition was to seek instruction and clarification, rather than termination.

The word "terminate" appears only three times in Kent's petition—all within nine lines of each other; all in the prefatory paragraphs of the section seeking "instruction"; always as an alternative to "modify[ing]" the trust; and nowhere in the prayer for relief. Not coincidentally, Kent's alternative references to modifying or terminating the trust mirror the language of section 15409, which authorizes a court to "*modify* the administrative or

23

dispositive provisions of [a] trust or *terminate* the trust" under appropriate circumstances. (§ 15409, subd. (a), italics added.) Thus, although the word "terminate" appears in Kent's petition, the practical effect of the petition was to seek instruction or clarification on how to deal with a trust that had become impossible to administer as written. (See *Donkin*, *supra*, 58 Cal.4th at pp. 433-434 ["the beneficiaries' claims, although sometimes couched in terms suggesting they are arguing the validity of [a trust amendment], at bottom seek an *interpretation* of the [trust] instrument, rather than to void any portion of it or to set aside its distributive plan"].)

## B. *The Probate Court Acted Within Its Authority*

Although Todd repeatedly invoked the probate court's statutory and equitable authority to modify Leonard's Trust, he now contends the court exceeded its authority in doing so.[15] We disagree.

### 1. Legal Principles

Under section 15409, subdivision (a), a court has authority to "modify the . . . dispositive provisions of [a] trust or terminate the trust if, owing to circumstances not known to . . . and not anticipated by the settlor, the continuation of the trust under its terms would defeat or substantially impair the accomplishment of the purposes of the trust." (See *Schwan v. Permann* (2018) 28 Cal.App.5th 678, 696-697 (*Schwan*).)

A court also has the "equitable power . . . to modify a trust under 'peculiar' or 'exceptional' circumstances where necessary to accomplish the purpose of the trustor(s) as expressed in the trust instrument." (*Ike v. Doolittle* (1998) 61 Cal.App.4th 51, 80 (*Ike*), italics omitted; see *Schwan*, *supra*, 28 Cal.App.5th at p. 697 [" ' "California courts have long had the

---

[15] Neither Kent nor Bond have raised any estoppel or forfeiture arguments based on Todd's inconsistent positions.

24

equity power to modify the terms of a trust where such modification is necessary to preserve the trust or *serve the original intentions of the trustor . . . .*" ' "]; *Trolan v. Trolan* (2019) 31 Cal.App.5th 939, 956 ["The court can alter administrative provisions of the trust under ' "peculiar" or "exceptional" circumstance[s]' where necessary to accomplish the purpose of the trustor."].)  A trial court's exercise of its equitable powers is reviewed for abuse of discretion.  (*City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224, 1256 (*Barstow*); *In re Marriage of Shimkus* (2016) 244 Cal.App.4th 1262, 1272.)

"The interpretation of a will or trust instrument presents a question of law unless interpretation turns on the credibility of extrinsic evidence or a conflict therein." (*Burch, supra*, 7 Cal.4th at p. 254; see *Key, supra*, 34 Cal.App.5th at p. 540.)  "The paramount rule in construing [a] trust is to determine the trustor's intent from the whole of the instrument and in accordance with applicable law." (*Estate of O'Connor* (2018) 26 Cal.App.5th 871, 878; § 21102, subd. (a); *Dae, supra*, 69 Cal.App.5th at p. 465 ["The intent of the trustor controls."].)  "In interpreting . . . a trust, it is proper for the trial court in the first instance and the appellate court on de novo review to consider the circumstances under which the document was made so that the court may be placed in the position of the . . . trustor whose language it is interpreting . . . ." (*Wells Fargo Bank v. Marshall* (1993) 20 Cal.App.4th 447, 453 (*Marshall*); see *Ike, supra*, 61 Cal.App.4th at p. 73.)

"Particularly in the field of interpreting trusts and wills, each case depends upon its own peculiar facts, and ' "precedents have comparatively small value." ' " (*Marshall, supra*, 20 Cal.App.4th at p. 453.)

25

## 2. Analysis

Although it is unclear from the appellate record whether the probate court based its modification of Leonard's trust on the court's statutory or equitable authority, we conclude the probate court acted within its authority under either theory.

In terms of the probate court's statutory authority, the court cited in its minute orders "certain facts that were not known to [Leonard] in coming up with his estate plan, i.e., (1) that certain assets named in the portions would be unavailable; (2) that his ex-wife's estate planning decisions were subject to change after his death and could not legally be used to affect his estate plan; and (3) that real property would have to be sold to make distribution equitable among the beneficiaries of his specific gifts." At a minimum, the first category provided the court with statutory authority to modify Leonard's Trust.

Specifically, it was undisputedly a "circumstance[ ] not known to . . . and not anticipated by [Leonard]" (see § 15409, subd. (a)) that the United B Fund was not a trust asset and, therefore, was unavailable to partially fund the Medical Sub-trust and Portion 1. This, alone, gave the probate court the authority to modify the trust.

In addition, it was similarly unknown to and unanticipated by Leonard that the recipient of Portion 4 would not undertake a $900,000 promissory note liability. As of trial in 2020—six years after Leonard's death—the promissory note still did not exist, and the probate court surmised it never would.[16]  Indeed, when Gale gifted Wade a property that her trust

---

[16]   The probate court stated at trial:  "Leonard's trust says, [']hey, there's a $900,000 promissory note['] but there isn't.  There isn't, and I don't think there will be, right?  Is anyone planning to execute a $900,000 note in hopes that something's going to happen when [Gale] dies?  I don't think so."

designated for the portion assigned to Kent, she effectively guaranteed there would never be an effective coordination between her and Leonard's trusts. Consequently, a substantial anticipated asset that was necessary to partially fund the sub-trusts and Portion 4 was unexpectedly missing from the trust's assets. This further supported the probate court's exercise of statutory authority to modify the trust.

Todd argues that one of the supposedly unknown circumstances the probate court cited—that Gale remained free to modify her trust after Leonard's death—was, in fact, known to Leonard and, thus, did not support the court's exercise of statutory authority under section 15409. Factually, we agree the record reflects that Leonard was aware that Gale and he were free to revise their revocable trusts after the other trustor's death. Legally, however, the probate court's mischaracterization of this circumstance is of no consequence because several other unknown and unanticipated circumstances support the court's exercise of statutory authority. (See *People v. JTH Tax, Inc.* (2013) 212 Cal.App.4th 1219, 1237 ["When a trial court states multiple grounds for its ruling," the appellant must address each of them "because 'one good reason is sufficient to sustain the order from which the appeal was taken.' "].)

As for the probate court's exercise of its equitable authority to modify Leonard's Trust, we are persuaded by Todd's assertion in his original petition that, "[i]n the present case, we have an exceptional situation [because] Leonard's Trust and Gale's Trust are both part of the expected distributions to their four sons." Thus, the probate court also had equitable authority to modify Leonard's Trust. (See *Barstow, supra,* 23 Cal.4th at p. 1256.)

At bottom, Todd's appellate challenge relates more to *how* the probate court exercised its authority than *whether* it had the authority in the first

27

place. Specifically, he asserts the probate court ignored that Leonard's intent—as evidenced by the creation of portions to be assigned by drawing straws—was to leave unequal distributions to his sons. We disagree. Reviewing Leonard's Trust de novo, we reach the same conclusion as the probate court: Leonard's "overarching goal was to create a plan that treated his sons equitably."

Portion 4, alone, proves the point. No one could seriously contend Leonard intended to leave one of his four sons only a net $800,000 *liability* through a new promissory note obligation. Yet, both sub-trusts and Portion 2 depended on such a note for funding. As even Todd acknowledges, Portion 4 makes sense only when read in conjunction with Portion 4 of Gale's Trust, which would leave the recipient of that portion the most valuable asset in her estate.

The straw-drawing procedure further supports the conclusion that Leonard intended for his sons to receive roughly equal distributions. Leonard's Trust provided that its four portions be assigned by drawing straws, *unless* "numbered straws were previously drawn under" Gale's Trust, in which case "the beneficiaries under [Leonard's Trust] shall receive the same numbered portion as the beneficiaries of [Gale's Trust] received." Gale's Trust had a similar reciprocal provision. The language and circumstances of the reciprocal straw-drawing procedures reflect that Leonard intended that each of his sons receive a roughly equal distribution. (See *Marshall, supra*, 20 Cal.App.4th at p. 453 [an appellate court "consider[s] the circumstances under which the document was made so that the court may be placed in the position of the . . . trustor whose language it is interpreting"].)

In sum, Leonard's Trust reflects that, notwithstanding its own unequal portions, Leonard's overarching intent was for his sons to receive roughly equal distributions from his and Gale's estates. The "fatal, fatal flaw," as the probate court observed at trial, was Leonard believing he could achieve this by coordinating with Gale's Trust. Thus, the probate court was tasked with the discretionary function of determining how best to implement Leonard's intent from his own trust assets.

We see no abuse of discretion in the probate court's determination that the best way to implement Leonard's intent was to sell the trust's assets and distribute the proceeds equally among the four sons. Indeed, this strikes us as the simplest and most efficient means of doing so. Todd's challenges to the court's discretionary approach do not persuade us otherwise.

For example, Todd criticizes the probate court for not merely delaying administration of Leonard's Trust until after Gale's death so that the trusts could be administered in tandem. Todd maintains this approach is supported by the fact the Education Sub-trust acknowledged it would not be fully funded until after Gale died and her trust made a $250,000 contribution to the sub-trust, and that the recipient of Gale's Portion 4 could eventually use revenue from a property in that portion to pay the promissory note to be given in Leonard's Portion 4. It was within the probate court's discretion to reject this approach for several reasons.

First, delaying administration of Leonard's Trust would conflict with its directive that the specified distributions be made "[u]pon the demise of the Trustor"—Leonard—not upon the demise of Gale. The fact that the Education Sub-trust "anticipated that an additional . . . $250,000 . . . will be added . . . *at the time of* [*Gale's*] *demise*" shows that Leonard knew how to express an intent that something happen upon Gale's death rather than his.

29

(Italics added.)  The fact Leonard did not draft the promissory note provision in this way suggests he intended that it be given at his death, not Gale's.

Second, Todd's proposed approach is not equitable.  Whereas Todd would immediately benefit from all the gifts in his Portion 3 (consisting entirely of two pieces of real property), Wade, Brittin, and Leonard's grandchildren would have to wait indefinitely to receive the full benefit of their gifts because the $900,000 promissory note would not be undertaken, if ever, until after Gale's death.

Finally, and relatedly, the probate court reasonably suspected the promissory note would never come to fruition because Gale had already gifted Wade a property designated by her trust for Kent's portion, thereby disrupting the equilibrium between Leonard's and Gale's Trusts.

Todd also argues that selling the real properties would conflict with Leonards' intent that they not be sold.  However, Todd cites no provision in Leonard's Trust indicating Leonard harbored such an intent.

Todd criticizes the probate court's distribution for undermining Leonard's intent that Brittin's interest be held in a spendthrift trust.  However, the spendthrift trust was conditioned on Brittin having a certain threshold of debt, and Todd has not established that Brittin exceeded that threshold in the ensuing six years since Leonard's death.

Finally, Todd complains that the probate court's apportionment would allow Kent to "reap" a windfall by giving him an equal share under Leonard's Trust and a disproportionately larger share under Gale's Trust.  This claim is fatally speculative because, as of the trial, Gale remained free to adjust the distributions in her trust so that the four sons ultimately received roughly equal distributions across her and Leonard's trusts.  Todd's complaint also ignores the fact Gale already gifted Wade a property originally designated by

30

her trust for the portion assigned to Kent (as determined by drawing straws under Leonard's Trust).

In sum, the probate court acted within its authority and discretion in modifying Leonard's Trust to distribute the trust assets equally among the four sons.

## III.  GUARDIAN AD LITEM'S APPEAL

Guardian ad litem Bond appeals the probate court's classification of gifts and application of the statutory abatement priority to those classifications.  Bond agrees with the court's classification of the gifts to the sub-trusts as general pecuniary gifts that would abate before specific gifts.  But he disagrees with the court's classification of the portions as specific gifts; rather, Bond maintains they are residuary gifts that abate before general gifts.  Alternatively, Bond contends Leonard's intent to fund the sub-trusts trumped the statutory order of abatement.  We agree with the probate court's classification of the gifts, and, although it is a closer call, also agree that the statutory order of abatement applies.

We will begin by discussing the applicable legal principles because they provide useful context for the additional factual background.

### A.  *Legal Principles*

"A revocable living trust . . . contains transfers to be effective on the death of the settlor.  Such transfers are statutorily described as at-death transfers."  (See *Blech, supra,* 25 Cal.App.5th at p. 1000, quoting § 21104.)  At-death transfers fall into six gift classifications:

> "(a) A *specific gift* is a transfer of specifically identifiable property.
>
> "(b) A *general gift* is a transfer from the general assets of the transferor that does not give specific property.

31

"(c) A *demonstrative gift* is a general gift that specifies the fund or property from which the transfer is primarily to be made.

"(d) A *general pecuniary gift* is a pecuniary gift within the meaning of Section 21118.[17]

"(e) An *annuity* is a general pecuniary gift that is payable periodically.

"(f) A *residuary gift* is a transfer of property that remains after all specific and general gifts have been satisfied."

(§ 21117, subds. (a)-(f), italics added; see *Blech*, at p. 1000.) We review de novo the probate court's classification of gifts when, as here, the facts are undisputed. (See *Blech*, at p. 1000.)

"Abatement" occurs when a trust has insufficient assets to satisfy all the gifts made by the trust. (See *Estate of Jenanyan* (1982) 31 Cal.3d 703, 706, fn. 2; *In re Buck's Estate* (1948) 32 Cal.2d 372, 376 [a gift "abates where there is a deficiency of assets"].) Unless a trust provides otherwise (§ 21400),[18] gifts provided for in the instrument abate in the following statutory order:

"(1) Property not disposed of by the instrument.

"(2) Residuary gifts.

---

17    A " 'pecuniary gift' means a transfer of property made in an instrument that either is expressly stated as a fixed dollar amount or is a dollar amount determinable by the provisions of the instrument." (§ 21118, subd. (b).)

18    Section 21400 states: "Notwithstanding any other provision of this part, if the instrument provides for abatement, or if the transferor's plan or if the purpose of the transfer would be defeated by abatement as provided in this part, the shares of beneficiaries abate as is necessary to effectuate the instrument, plan, or purpose."

"(3) General gifts to persons other than the transferor's relatives.

"(4) General gifts to the transferor's relatives.

"(5) Specific gifts to persons other than the transferor's relatives.

"(6) Specific gifts to the transferor's relatives."

(§ 21402, subd. (a)(1)-(6); see *Burkett v. Capovilla* (2003) 112 Cal.App.4th 1444, 1452.) A court need not apply this statutory order of abatement if doing so would defeat the trustor's "plan or . . . the purpose of the transfer." (§ 21400.)

## B. *Background*

At the outset of trial, the probate court announced its tentative ruling to classify the Education and Medical Sub-trusts as general pecuniary gifts and the portions (other than a general gift of $50,000 in cash) as specific gifts. The court acknowledged "it's tempting to call the portions residuary gifts," but found "[t]hey are specific gifts" because they "specifically identify property that goes to specific people." Based on these classifications, the court tentatively ruled the sub-trusts would abate and the portions would survive.

In discussing whether Leonard's intent conflicted with the statutory order of abatement, the court acknowledged "the trust language talks about" establishing the potions "*after* the subtrusts have been established."[19]

---

[19] The court appears to have been referencing Paragraph 3 of Schedule B to Leonard's Trust, which states in part: "After the trust specified in paragraphs 1. and 2. above [i.e., the Education and Medical Sub-trusts] have been established, and after the payments of any federal estate taxes and other costs incurred in the settlement of the estate of the Trustor have been made, the Trustee shall divide the remaining assets to be disposed of under this Schedule 'B' into four (4) separate portions . . . ."

33

(Italics added.)  This, "in some ways," could indicate the sub-trusts were "intended to go in front of the other gifts."  But "in looking at the trust as a whole" and in "considering the intent of the transferor," the court reasoned "the timing is just incidental" and "there is no reason . . . why the subtrust[s] would have to be created first, that everything could happen at the same time."

Bond argued the portions were residuary because paragraph 3 of Schedule B stated, "that *after* [the sub-trusts are] established, the trustee shall divide the *remaining* assets . . . into the four separate *portions*."  (Italics added.)  He also noted attorney McEwan had testified in deposition that Leonard "expressed the thought that these pecuniary gifts should be paid out first."

Bond further argued that "a very narrow interpretation" of the statutory order of abatement "would defeat the intentions of [Leonard]."  The court responded that this was "an important consideration," but explained that Leonard's intent was not clear:

> "If I had a blinding clear view of what [Leonard] was trying to do, then I would be following that without regard to the lavish adherence to the construction rules.  The problem is here is that he seemed to want to do a lot of stuff . . . he didn't have the power [or] . . . the money to do.  So it's hard for me to parse all of that out and figure out, okay, well, if he knew that basically his plan was terrible, and there was tons of problems, then what would he want?  Would it be more important that his four sons inherit the properties that he had managed or would it be more important to set up an educational trust and a medical trust and frankly that is obscure to me.  I'm not . . . quite sure what he would have decided, and I don't know that he formed an intent on that because he thought . . . he had this great plan, lots of money, lots of property, and great cooperation, and all this stuff that he didn't have."

The probate court's minute orders after trial mirrored the court's tentative ruling on classification and abatement.

### C. *Analysis*

We independently reach the same conclusion as the probate court regarding gift classification. Leonard's gifts to the portions constitute specific gifts because they transfer specific property (e.g., "A 100% interest . . . in [a] duplex" or "A 50% interest in the bank accounts of Trustor") to specific people (Leonard's sons as specified by drawing straws). (See § 21117, subd. (a) ["A specific gift is a transfer of specifically identifiable property."].)

The fact that Leonard's Trust refers to the property conveyed via the portions as "*remaining* assets" (italics added) does not convert them to residuary gifts. By definition, "[a] residuary gift is a transfer of property that remains after all specific . . . gifts have been satisfied." (§ 21117, subd. (f).) Because the portions convey specific property to specific people, they are specific gifts; no residuary gift can arise until those specific gifts are satisfied.

Moreover, contextually, the "remaining assets" here were hardly a remainder—they made up the vast majority of the trust's assets. According to the Spreadsheet, the equity in the real properties (about $1.9 million; see fn. 8, *ante*), bank accounts ($200,000), and one-half interest in the United B Fund ($250,000) that Leonard gifted to the portions comprised about $2.35 million—about 87 percent—of his estate's total equity of about $2.7 million.

Bond relies on *Blech, supra*, 25 Cal.App.5th 989 to support the proposition that a residuary gift's reference to specific property does not transform the nature of the gift from residuary to specific. In *Blech*, article 5.2 of the relevant trust distributed the trustor's personal effects; article 5.3, titled "Specific Distributions" (*id.* at p. 1004, fn. 36), made "specific distributions of cash" and "specified parcel[s] of real property" to various of

35

the trustor's children; and article 5.4, titled "Division of Remaining Trust Estate" (*id.* at p. 1002), distributed "the remainder of the trust estate" in varying percentage to the trustor's children, with one son to receive 35 percent, "provided that [his] share 'shall include any interest that [the trustor] . . . owns in [a particular ranch]' " (*id.* at p. 993).  The probate court found the interest in the ranch was a specific gift, but the Court of Appeal disagreed, concluding it was a residuary gift that merely specified a potential source of funding.  (*Id.* at pp. 999, 1003.)

"Most importantly," the *Blech* court observed that if the trustor had intended the interest in the ranch to be a specific gift, he would have included it in article 5.3 titled "Specific Distributions," in which he had made several "unconditional and specific" gifts of "certain real property" to the son and another child.  (*Blech, supra,* 25 Cal.App.5th at pp.1003-1004.)  "Neither gift was dependent on any other event." (*Id.* at p. 1004.)  "By contrast," the *Blech* court reasoned, the trust's identification of the ranch in the residuary distribution was merely a conditional, potential source of funding for the son's 35 percent interest in the trust's residue.  (*Ibid.* ["the gift of the [r]anch . . . was to occur *only if* at the time of the distribution of the remainder of the trust assets, those assets included the [r]anch"].)  Because article 5.4 specified only "*how to fund* [the son]'s percentage share of the remainder or residue and not *what specific property to give*," the *Blech* court concluded it was merely "a gift of a 35 percent share of the residue . . . and not a specific gift . . . ." (*Ibid.*)

*Blech* is readily distinguishable.  "Most importantly" (*Blech, supra,* 25 Cal.App.5th at p. 1003), Leonard's Trust did not make specific gifts to his four sons in one paragraph, and then leave conditional, residuary percentages to them in a later paragraph.  Instead, the portions in Leonard's Trust are

36

more analogous to the gifts of "certain real property" in the "Specific Distributions" article of the *Blech* trust. Indeed, as noted, the bulk of Leonard's Trust assets—including all of its real estate holdings—were distributed in the portions. And there was nothing conditional about the portions' distribution of those properties—the portions conveyed "A 100% interest" in specified real property to the assigned recipient of the portion. (See *id*. at p. 1004 ["This means of expressing the desire that, *if* the [r]anch were in the estate at the date of distribution, *then* it was to be used in funding [the son]'s share of the residue, rendered the gift of the [r]anch an instruction to the [t]rustee on that with which to fund the percentage gift which [the trustor] unequivocally made to [the son] *if* the [r]anch were an asset of the [t]rust at that time, rather than a mandate that [the son] was to receive the [r]anch," last italics added].)

We, thus, agree with the probate court that the portions constitute specific, rather than residuary, gifts.

The closer call is whether, notwithstanding this classification, Leonard's intent prevails over the statutory order of abatement such that the probate court erred by ordering abatement of the sub-trusts before the portions. We see no error.

On this issue, Bond relies primarily on the fact the sub-trusts appear earlier in Leonard's Trust and the trust specifies that the trustee shall establish the portions only "after" the sub-trusts have been established and taxes and trust expenses have been paid. This argument has some superficial appeal. Ultimately, however, we agree with the probate court's observation that there is no "blinding[ly] clear view of what [Leonard] was trying to do" and whether he would have intended that the beneficiaries

37

under the sub-trusts receive priority over the recipients of the portions once it became evident Leonard could no longer accomplish everything he hoped to.

Again, Leonard's Trust allocates the vast majority of equity in the trust assets to the four sons. In contrast to the approximately $2.35 million in equity allocated to the portions, the trust allocated only $250,000 in equity—about 11 percent of the estate's total equity—for the sub-trusts. Moreover, the vast majority of funding for the sub-trusts was to come from Gale's Trust assets, not Leonard's. That is, other than Leonard's $250,000 equity contribution, the remaining funding for the sub-trusts was to come from an anticipated $250,000 contribution from Gale, and two $300,000 distributions from the illusory $900,000 promissory note to be backed by the assets in Portion 4 of Gale's Trust.

Relatedly, although the sub-trusts appear earlier in the trust, neither sub-trust could be fully funded without the establishment of the promissory note in Portion 4. Thus, the timing was, at best, incidental, and, more likely, actually required the distribution of the portions before the sub-trusts could actually be funded.

Bond also cites the fact the estate planning attorney testified in deposition that "one of [Leonard's] objectives" in the trust was to fund the sub-trusts "off the top." It is unclear from the appellate record whether the probate court considered this evidence or found it credible. And, in any event, this snippet of testimony out of context sheds no light on what Leonard's priorities would have been had he known his trust would face the severe funding failures it ultimately faced.

Leonard devised an elaborate and well-intentioned estate plan that sought to provide for his sons, grandchildren, and heirs. The plan, however, was too heavily dependent on funding contingencies that—even six years

after his death—still had not panned out, leaving the trust unable to satisfy all the gifts it purports to make.  For the reasons just discussed, we see no clear expression of intent from Leonard or his trust that he would have prioritized the gifts to the sub-trusts over the gifts to the portions.  Accordingly, the probate court properly applied the statutory order of abatement to the sub-trusts.

## IV.  DISPOSITION

The orders are affirmed.  Kent to recover his costs on appeal.


HALLER, Acting P. J.


WE CONCUR:


O'ROURKE, J.


AARON, J.